## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DVORA WEINSTEIN AND STEVEN S. WEINSTEIN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>AUBREY K. McCLENDON and CHESAPEAKE ENERGY CORPORATION,<br><br>Defendants. | Case No. CIV-12-465-W<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs Dvora Weinstein and  Steven S. Weinstein, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chesapeake Energy Corporation ("Chesapeake" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of a class consisting of all persons other than Defendants who purchased common stock of Chesapeake Energy Corporation ("Chesapeake" or the "Company") between April 30, 2009 and April 17, 2012 (the "Class Period") and were damaged thereby (the "Class"). The action seeks to recover damages caused by Defendants' violations of the federal securities laws set forth in the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Chesapeake was co-founded in 1989 by Defendant Aubrey K. McClendon ("McClendon"), who is presently Chief Executive Officer and Chairman of the Board. The Company is a leading natural gas producer, and has very aggressively promoted the use of fracking to extract previously unrecoverable reserves.

3.     Indicative of his dominance of the Company and its Board of Directors, McClendon was the highest-paid CEO at all S&P 500 companies in 2008—receiving a compensation package totaling $112 million, plus an additional payment of $12.1 million for purchase of antique maps in his personal art collection. This outsized award was designed to bail out McClendon, who had margined virtually all of his Chesapeake stock holdings for personal loans in excess of $600 million. When Chesapeake's stock price tumbled in 2008 (due to the Company's poor earnings and excess debt), McClendon's margined stock was called to pay off the loans, and his holdings were wiped out.

4.     While McClendon currently owns roughly 1.35 million shares of Chesapeake stock (presently worth approximately $24 million), this interest is dwarfed by McClendon's share of Chesapeake's oil and gas wells pursuant to the Company's Founders Well Participation Program (the "FWPP"). Under that program, McClendon has the right to purchase a 2½%

2

interest in each well drilled by Chesapeake, must pay a proportionate share of related costs, and is entitled to a proportionate share of revenues generated therefrom.

5.      McClendon has participated aggressively in this program, and amassed interests currently valued at over $300 million. However, because of large up front development and operating costs, McClendon's FWPP interests are significantly underwater and have yet to generate any positive cash flow.

6.      Unbeknownst to Class members, starting in 2009, McClendon leveraged *all* of his FWPP interests in order to pay up front development costs. He not only secured loans on his ownership interests in the wells, but also sold off revenue "participation rights" in the wells. McClendon also secured a personal loan in excess of $500 million from EIG Global Energy Partners ("EIG"), a hedge fund that engaged in financing transactions with Chesapeake.

7.      As a result, by year end 2011, McClendon had amassed personal debt on Chesapeake related wells and parties exceeding $1 billion. The size of the debt and McClendon's leveraging of all his FWPP related interests represented material undisclosed risks to Chesapeake investors. Its CEO was excessively leveraged, and his ability to satisfy those debts was dependent upon the Company's successful performance of the mortgaged wells.

8.      As gas prices tumbled through 2011, those undisclosed risks exponentially increased as both Chesapeake and McClendon faced significant challenges to pay off debts and finance ongoing operations.

9.      It was not until April 18, 2012 that these previously undisclosed details were widely disclosed by investigative reports published by Reuters and the Wall Street Journal. Analysts reacted negatively. As Joseph Allman, an oil and gas industry analyst at JPMorgan in New York, noted regarding McClendon $500 million loan from EIG:

In the same way that investors want to know the counterparty to
significant Chesapeake transactions, they would want to know if
one of those firms has significant private dealings with the CEO.

10.     Investors were equally troubled. Chesapeake shares plummeted $1.06—or

5.5%—representing over $500 million in market value losses.

11.     On April 26, 2012, Chesapeake abruptly terminated the FWPP program, while

Board members disclaimed any knowledge of the size of McClendon's indebtedness.

Chesapeake shares are now trading at less than $18.00 per share.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act, 15 U.S.C. §§ 78j (b) and 78t(a), and Rule 10b-5 promulgated thereunder by

the SEC, 17 C.F.R § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and

28 U.S.C. § 1391(b).  Chesapeake maintains its principal place of business in this District and

many of the acts and practices complained of occurred in substantial part herein.

15.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national

securities markets.

## PARTIES

16.     Plaintiffs Dvora Weinstein and Steven S. Weinstein as set forth in the

accompanying certification incorporated by reference herein, purchased Chesapeake securities in

a joint account with right of survivorship at artificially inflated prices during the Class Period and were damaged thereby.

17.     Defendant McClendon, Chesapeake's CEO and Chairman of the Board, has served in these capacities since co-founding the Company in 1989.

18.     Defendant Chesapeake, an Oklahoma corporation, maintains its principal place of business at 6100 North Western Avenue, Oklahoma City, Oklahoma.  The Company focuses on the exploration for and production of natural gas.  It was founded in 1989 and went public in February 1993.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     According to its public filings, Chesapeake is "the largest independent producer of natural gas in the United States."  The Company's operations are focused on discovering, developing, and acquiring conventional and unconventional natural gas reserves onshore in the United States.

20.     McClendon co-founded Chesapeake in 1989, and the Company went public in 1993.  Since the Company's founding, McClendon has not only served as Chairman and CEO, but benefited from purchasing ownership stakes in many of the natural gas wells Chesapeake has developed under the FWPP.

21.     As noted in the Company's IPO documents, and repeated consistently thereafter, the FWPP program was intended to align McClendon's interests with those of the Company, since he would be investing, and sharing the risks and rewards of drilling, on the same basis as the Company.  Such side-by-side participation, the Defendants insisted, would incentivize McClendon to make decisions that would benefit the Company and its public shareholders.

22.    The FWPP was formally approved by Chesapeake shareholders at the Company's annual meeting of shareholders on June 10, 2005. Such approval was based on representations regarding the purported benefits of the program in aligning McClendon's interests with that of the Company and its shareholders;

- Since the long-term success of the Company is dependent on its ability to conduct oil and gas exploration and production profitably, the participation program instills discipline in the Company's long-term strategy by imposing risks on the Founders which are identical to the risks incurred by the Company.

- The Company's stock price fluctuates based on many industry-related factors that are not within the control of our management, including volatility of oil and gas prices and global supply/demand trends for natural resources. The participation program provides an additional mechanism for providing direct incentives to the Founders to create long-term value through the efficient development of the Company's resource base.

- Our Founders are personally and professionally incentivized to maintain their focus on the growth, success and profitability of the Company's operations since such operations have a direct impact on the Founders.

23.    On or about April 29, 2008, Chesapeake filed its 2008 Proxy Statement with the SEC, wherein it again touted the purported benefits of the FWPP, in that it "fosters and promotes the development and execution of the Company's business by: (a) retaining and motivating our chief executive officer who co-founded the Company; (b) aligning the financial rewards and risks of Mr. McClendon with the Company more effectively and directly than other performance incentive programs maintained by many of the Company's peers; and (c) imposing on Mr. McClendon the same risks incurred by the Company in its exploration and production operations."

## The Materially False and Misleading Statements

24.    On or about April 29, 2011, Chesapeake filed its annual meeting proxy statement on Schedule 14A with the SEC. The proxy statement disclosed that since 2008, McClendon's

payments to the FWPP exceeded the revenues he received from the program by approximately $358.7 million. However, the apparent risk presented by the size of this negative cash flow was substantially offset by disclosure of the significant current value of McClendon's ownership stake, *i.e.*, $308 million.

25.    The Proxy Statement also referenced McClendon's participation in sales of *certain* properties owned through the FWPP.

> Engineering Support – Mr. McClendon receives support services from certain of the company's reservoir engineering staff who provide reserve data and analysis related to personal financing transactions entered into by Mr. McClendon with respect to *certain* of his interest in the company's wells acquired under the FWPP. (pg. 39). (emphasis supplied)

> Mr. McClendon's interests are his personal assets and the FWPP does not restrict sales, other dispositions or financing transactions involving FWPP interests previously acquired from the Company. From time to time, Mr. McClendon has sold FWPP interests in conjunction with sales by the Company of its interests in the same properties, and the proceeds related to the properties have been allocated between Mr. McClendon and the Company based on their respective ownership interests. As a condition to the sale of the Company's Fayetteville Shale assets completed on March 31, 2011, Mr. McClendon's affiliates sold the FWPP interests they held in the Fayetteville Shale on the same terms as those that applied to the Company's developed producing properties included in the sale (pg. 62).

26.    Prior to 2011, McClendon had engaged Chesapeake in a torrid campaign to purchase a significant amount of shale oil and gas properties (using borrowed funds) in the hope of exploiting new fracking techniques that facilitated the recovery of previously inaccessible reserves. However, this modern day "gas rush" resulted in an oversupply of natural gas, thereby precipitating a significant decline in the prices to lows not seen in over a decade. Thus, the cost/benefit of Chesapeake's aggressive acquisition and drilling program became highly uncertain, and its stock price began to slide as well.

27.    The decline in the price of natural gas and Chesapeake shares compounded the risk to investors presented by the Company's mammoth $10 billion plus debt load, far greater

than Exxon's, whose market cap was 32 times larger than Chesapeake's. Desperate to rapidly reduce its debt load and generate operating funds, Chesapeake engaged in a series of transactions whereby it monetized interests in developed wells, and sold shares in joint ventures for other properties.

28.     On November 3, 2011, Chesapeake announced that it had raised critically needed cash by, among other things, selling $500 million of perpetual preferred shares in a related entity, CHK Utica LLC, and that it expected to sell an additional $750 million of such shares by the end of the month. CHK Utica owned 700,000 of acres in the Utica Shale play located in Ohio. The sale was made to EIG Global Energy Partners.

29.     In touting the benefits of this transaction, McClendon stated:

> We are pleased to announce the signing of an LOI for our industry JV in the Utica Shale and also the closing of the $500 million initial investment by the EIG-led investor group. Through the industry JV, we will be able to recover more than our total leasehold investment in the entire Utica Shale play while only selling approximately 142,500 net acres of our 1.5 million net acres of Utica Shale leasehold. Through the financial transaction led by EIG, our drilling program in CHK Utica is almost entirely funded for the foreseeable future (including cash flow from anticipated production). We have achieved very strong initial drilling results in the wet natural gas and dry natural gas areas of our Utica Shale play and are beginning to accelerate our evaluation of the oil area of the play, which the EIG transaction will help enable.

30.     On December 5, 2011, Chesapeake announced completion of the second tranche of the transactions to a consortium led by EIG, thus netting $1.25 billion altogether.

## THE MISLEADING NATURE OF THE FOREGOING STATEMENTS

31.     The statements referenced in ¶¶ 24–30 above were materially misleading because they failed to disclose material adverse facts about the significant degree to which McClendon had not only leveraged **all** his FWPP holdings, but had taken out hundreds of millions of dollars of personal loans from the very Company that was buying interests in Chesapeake's substantial gas and oil properties, EIG. These omissions (i) concealed the true degree of risks facing

8

Chesapeake's CEO, and thereby his Company and investors therein; (ii) presented undisclosed potential conflicts between McClendon and Chesapeake given that (a) McClendon had sought personal loans from the same Company financing Chesapeake loans (which could impact lending rates); and (b) McClendon's mortgaging of all his interests in the existing wells could impact his decisions regard further exploration and development of undeveloped wells.

32. Specifically:

    a. After his debacle of 2008, McClendon was strapped for cash to cover the significant costs for his yearly participation in the FWPP program. He thereupon entered into a series of transactions with EIG related entities whereby he transferred FWPP interests in return for cash sufficient to cover his yearly payments to the operations in wells whose interests he previously acquired, along with new wells being developed each year. In particular:

        i. In 2009, McClendon transferred *all* of his FWPP rights for 2009 and 2010 to Larchmont Resources, an entity formed by EIG;

        ii. Thereafter, McClendon transferred *all* of his FWPP rights for 2011 and 2012 to Jamestown Resources, another entity formed by EIG;

        iii. The transactions entitled the EIG related entities to receive 100% of the cash flow from the FWPP interests until the EIG entities were fully paid back plus 13% realized return, and thereafter to receive 42% of McClendon's profits from the wells "in perpetuity."

    b. In addition to the foregoing, McClendon received a $1 billion loan from EIG in November 2011, which was in addition to the $375 million loan he had

previously received from TCW Energy Fund, which was managed by personnel who subsequently organized EIG.

c. In sum, rather than using the FWPP program to align his interests with the Company, McClendon off loaded those interests in return for substantial sums (that he could use to pursue other ventures), while rendering himself highly leveraged and, as in 2008, highly vulnerable in the event of an economic downturn.

d. As the Chairman and CEO of Chesapeake, McClendon's mortgaging of not just "certain," but **all** of his interests in the Company wells, along with securing personal loans from third parties engaged in substantial and critically important transactions with Chesapeake, were material undisclosed risks to investors, as well as a clear breach of McClendon's duty of candor.

e. The failure to disclose this material information also concealed risks faced by Chesapeake. Given the highly leveraged financial condition of its key executive, banks and other lenders would likely insist on higher interest charges when lending to the Company, which would have an adverse impact on its earnings.

f. In addition, McClendon's excess leveraging of his interests in existing wells presented an undisclosed conflict in that it could impact his decisions regarding whether to expend the Company's financial resources to focus on the wells under development (in which he had some stake), or those not yet drilled (in which he had no stake as of yet).

10

## THE TRUTH EMERGES

33.   On April 18, 2012, Reuter's news agency revealed that McClendon, through affiliates had secured up to $1.1 billion in loans to enable him to invest in the FWPP, including as much as $500 million from EIG. The article pointed out, among other things, that such huge loans raise the spector of conflicts of interest that could bias McClendon's judgment on key issues ranging from how quickly Chesapeake should generate cash flow, to how it operates wells, to how aggressively it can bargain with lenders like EIG on financing terms:

> In the same way that investors want to know the counterparty to significant Chesapeake transactions, they would want to know if one of those firms has significant private dealings with the CEO

34.   On April 18, 2012, Chesapeake shares plummeted $1.06—or 5.5%—representing a loss of over $500 million in market value. It subsequently fell to as low as $17.44 on April 20, 2012. It continues to trade at less than $18.00 per share.

35.   Analysts linked this significant decline to revelations regarding McClendon's undisclosed leveraged financial condition, and noted that the decline was also likely a reflection of the market's belief that these revelations could result in Chesapeake having to pay higher interest rates for critically needed borrowing.

### Subsequent Developments

36.   On April 20, 2012, Chesapeake filed its preliminary proxy statement with the SEC, disclosing for the first time greater details, but not all, regarding McClendon's excessive leveraging and potential conflicts:

> From time to time, Mr. McClendon has sold FWPP interests separately and concurrent with sales by the Company of its interests in the same properties. In any concurrent sales the proceeds related to the properties have been allocated between Mr. McClendon and the Company based on their respective ownership interests. *[During 2011, Mr. McClendon advises that he realized $   million from such sales, net of his $   million share of deal costs. According to Mr. McClendon, his net investment in these properties was $   , including lease*

*costs and well costs paid to the Company, less revenues paid by the Company.] Additionally, over the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory relationships with the Company. Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund Mr. McClendon's well costs. The Company does not extend loans to Mr. McClendon for participation in the FWPP or any other purposes. The Company does not review or approve financings of Mr. McClendon's personal assets, including his FWPP interests. In addition, the Company has no obligation to repay any loans Mr. McClendon may obtain nor are any of the Company's interests in any assets exposed to such loans or the mortgages securing them.* [blanks in original, emphasis supplied].

## SCIENTER

37.     McClendon clearly knew about all his undisclosed personal financing. He had a duty to disclose these facts given the heightened risk to investors that they presented, and duty of complete candor that he owed investors. His scienter is unassailable.

38.     Chesapeake has admitted that it knew that McClendon engaged in "personal financing transactions." As the Company's general counsel stated in an interview with Reuters reporters:

> The Board is familiar with the fact that Mr. McClendon has pledged his working interests to secure loans. Since the transactions you are reviewing are typical of our industry, concern his personal finances and the company was not a party to them, the Board did not review or approve the transactions.

39.     Thus, the Company has admitted that it turned a blind eye to McClendon's leveraging activities, despite the fact that it was aware of McClendon's proclivity in this area. Indeed, the Company had been called upon to bail out McClendon once before, in 2008, because of his excess leveraging of Company related assets—at that time, his Chesapeake shares.

40.     The Company was particularly reckless in failing to determine the sources of McClendon's financing of Company related assets to make sure they did not present any conflicts with its own financing activities. The Company's failure to discern and disclose EIG's

role in simultaneously financing Chesapeake's operations (by purchasing preferred shares in well related entities) while also financing McClendon's personal interests in some of those same wells, was clearly reckless.

## CLASS ACTION ALLEGATIONS

41.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Chesapeake common stock during the Class Period  and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Chesapeake common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Chesapeake or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

13

44.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chesapeake;

- whether the McClendon caused Chesapeake to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Chesapeake securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

47.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Chesapeake securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and Class members purchased and/or sold Chesapeake securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

48.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) and Rule 10b-5 Promulgated Thereunder)

49.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

50.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Chesapeake securities; and (iii) cause Plaintiffs and other members of the Class to purchase Chesapeake securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

52.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Chesapeake securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Chesapeake's finances and business prospects.

53.     By virtue of his position at Chesapeake, McClendon had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In

addition, Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As Chairman and CEO of Chesapeake, McClendon had intimate knowledge of the Company's internal affairs.

55.     McClendon is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, McClendon was able to and did, directly or indirectly, control the content of the statements of Chesapeake. As an officer and Chairman of a publicly-held company, McClendon had a duty to disseminate timely, accurate, and truthful information with respect to Chesapeake's businesses, operations, future financial condition and future prospects.

56.     As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Chesapeake common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Chesapeake's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased Chesapeake common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

57.     During the Class Period, Chesapeake securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Chesapeake securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the

other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.

58.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the

### Exchange Act Against McClendon)

60.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.     During the Class Period, McClendon participated in the operation and management of Chesapeake, and conducted and participated, directly and indirectly, in the conduct of Chesapeake's business affairs.   Because of his senior position and personal involvement in the FWPP, he knew the adverse non-public information about Chesapeake's misstatement of the terms of the FWPP.

62.     As an officer and/or director of a publicly owned company, McClendon had a duty to disseminate accurate and truthful information with respect to Chesapeake's financial condition and results of operations, and to correct promptly any public statements issued by Chesapeake which had become materially false or misleading.

63.     Because of his position of control and authority as a senior officer, McClendon was able to, and did, control the contents of the various reports, press releases and public filings which Chesapeake disseminated in the marketplace during the Class Period concerning Chesapeake's results of operations.   Throughout the Class Period, McClendon exercised his power and authority to cause Chesapeake to engage in the wrongful acts complained of herein. McClendon therefore was a "controlling person" of Chesapeake within the meaning of Section 20(a) of the Exchange Act.   In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Chesapeake securities.

64.     By reason of the above conduct, McClendon is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chesapeake.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  April 26, 2012

/s/ John E. Barbush
John E. Barbush, OBA#17837
**JOHN E. BARBUSH, P.C.**
120 N. Robinson Avenue, Suite 2700
Oklahoma City, Oklahoma 73102
Telephone:  (405) 604-3098
Facsimile:  (405) 604-7503

**POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

***Attorneys for Plaintiffs***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Dvora Weinstein, on behalf of Dvora Weinstein and Steven S. Weinstein -- With Rights of Survivorship, make this declaration pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995.

2      I have reviewed a Complaint against Chesapeake Energy Corp. ("Chesapeake"), and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Chesapeake securities at the direction of counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Chesapeake during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      To the best of my current knowledge, the attached sheet lists all of my transactions in Chesapeake securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury that the foregoing is true and correct.


Executed  *April 26 2012* ,  at   *Flushing New York*
                     (Date)                          (City, State)

                                       *Dvora Weinstein*
                                       (Signature)


                               *DVORA WEINSTEIN*
                               (Type or Print Name)

**CHESAPEAKE ENERGY CORP**

**04/26/2012vk**
**WEINSTEIN, D. & S.**

**LIST OF PURCHASES AND SALES**

| DATE | SEC TYPE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|----------|------------------|-------------------|-----------------|
| 1/6/2012 | COM STK | PUR | 300 | $24.0000 |
| 1/6/2012 | Jan13 P20 | SLD | 5 | $2.5000 |
| 2/29/2012 | Jan13 P20 | PUR | 5 | $1.7100 |
| 2/29/2012 | Mar12 C24 | SLD | 3 | $0.6000 |
| 3/13/2012 | Mar12 C24 | PUR | 3 | $0.5000 |

chk\chk1_a