## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

DVORA WEINSTEIN and STEVEN S.
WEINSTEIN, Individually and On Behalf of All
Others Similarly Situated,

        Plaintiffs,

        -v-

AUBREY K. MCCLENDON, DOMENIC J.
DELL'OSSO, JR., MARCUS ROWLAND,
MICHAEL A. JOHNSON, JEFFREY L.
MOBLEY, HENRY HOOD, and CHESAPEAKE
ENERGY CORPORATION,

        Defendants.

**Case No.: 12:5-cv-00465-M**

**CLASS ACTION**

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS
## CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND OVERVIEW ............................................................................ 1

ARGUMENT........................................................................................................... 5

I.    THE HEIGHTENED STANDARDS FOR PLEADING SECURITIES
FRAUD.......................................................................................................... 5

II.   THE COMPLAINT'S "PUZZLE PLEADING" FORMULA MANDATES
DISMISSAL ................................................................................................... 6

III.  THE COMPLAINT FAILS TO ALLEGE PARTICULARIZED FACTS
DEMONSTRATING FRAUDULENT INTENT ................................................. 7

IV.  THE COMPLAINT FAILS TO ALLEGE A COMPELLING THEORY OF
FRAUD.......................................................................................................... 9

      A.    Plaintiffs Cannot Allege Any Indicia Of Securities Fraud........................ 10

      B.    Any Inference Of Fraud Is Affirmatively Refuted By The
Acquisition Of Stock During The Class Period ......................................... 10

      C.    Plaintiffs' Fraud Accusations Fail Because They Are Cobbled
Together From Disparate Parts .................................................................. 13

      D.    The Underlying Claims Are Demonstrably False ...................................... 13

            1.    The FWPP Allegations Are Refuted By The Documents Cited
In The Complaint ........................................................................... 13

                 a.    Plaintiffs' "Alignment" Allegations Are Baseless............... 14

                 b.    Plaintiffs' "Related Party" Allegations Are Baseless .......... 17

            2.    The VPP Allegations Are Baseless ................................................. 18

V.    CLAIMS OF SECURITIES FRAUD CANNOT BE BASED ON
GENERALIZED STATEMENTS OR CORPORATE
MISMANAGEMENT ..................................................................................... 22

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Andropolis v. Red Robin Gourmet Restaurants, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007) ................................................................ 11, 22, 24

*Backe v. Novatel Wireless ,Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ....................................................................... 25

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
   833 A.2d 961 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del.  2004) .............................. 17

*Brogren v. Pohlad*,
   933 F. Supp. 793 (D. Minn. 1995) ............................................................................. 11

*Burekovitch v. Hertz*,
   2001 WL 984942 (E.D.N.Y. July 24, 2001) ................................................................ 17

*Caprin v. Simon Transp. Servs., Inc.*,
   99 F. App'x 150 (10th Cir. 2004) ................................................................................. 8

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ...................................................................................................... 1

*City of Omaha Emp. Ret. Sys. v. CBS Corp.*,
   2010 WL 1029290 (S.D.N.Y. Mar. 16, 2010) ........................................................ 17, 18

*City of Phila v. Fleming Cos., Inc. (Fleming II)*,
   2000 U.S. Dist. LEXIS 21427 (W.D. Okla. Feb. 4, 2000)
   *aff'd*, 264 F.3d 1245 (10th Cir. 2001) ..................................................................... 9, 25

*City of Phila. v. Fleming Cos., Inc. (Fleming I)*,
   No. CIV-96-853-M (W.D. Okla. Mar. 4, 1999) ........................................................ 8, 9

*City of Phila. v. Fleming Cos., Inc. (Fleming III)*,
   264 F.3d 1245 (10th Cir. 2001) ................................................................... 5, 9, 20, 21

*City of Pontiac Emp. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*,
   806 F. Supp. 2d 1267 (N.D. Ga. 2011) ......................................................................... 7

*City of Roseville Emp. Ret. Sys. v. Horizon Lines, Inc.*,
   686 F. Supp. 2d 404 (Del. 2009) ................................................................................ 24

# TABLE OF AUTHORITIES

### (continued)

**Page(s)**

*Day v. Staples, Inc.*,
    555 F.3d 42 (1st Cir. 2009) ........................................................................ 20

*Desai v. Gen. Growth Props., Inc.*,
    654 F. Supp. 2d 836 (N.D. Ill. 2009) .............................................................. 24

*Druskin v. Answerthink, Inc.*,
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) .................................................... 10, 12

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .......................................................................... 24

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    594 F.3d 783 (11th Cir. 2010) ...................................................................... 10

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ........................................................................................ 5

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ................................................................ 5, 23

*In re Adolor Corp. Sec. Litig.*,
    616 F. Supp. 2d 551 (E.D. Pa. 2009) ............................................................ 12

*In re Alcatel Sec. Litig.*,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005) ............................................................ 7

*In re Australia Banking Grp. Ltd. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ................................................ 24

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) .......................................................... 12

*In re Chesapeake Energy Corp. Sec. Litig.*,
    CIV-97-1360-L (W.D. Okla. Mar. 3, 2000) ........................................ 9, 14, 20

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996) .............................................................. 22

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
    738 F. Supp. 2d 614 (D. Md. 2010) .............................................................. 24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Crocs, Inc. Sec. Litig.*,
  774 F. Supp. 2d 1122 (D. Colo. 2011) ........................................................ 25

*In re Donald Trump Casino Sec. Litig.*,
  793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993) ................................ 17

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ............................................... 7

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................................ 11

*In re FVC.com Sec. Litig.*,
  136 F. Supp. 2d 1031 (N.D. Cal. 2000),
  *aff'd*, 32 F. App'x 338 (9th Cir. 2002) ........................................................ 12

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................... 22

*In re HomeBanc Corp. Sec. Litig.*,
  706 F. Supp. 2d 1336 (N.D. Ga. 2010) ...................................................... 10

*In re Huffy Corp. Sec. Litig.*,
  577 F. Supp. 2d 968 (S.D. Ohio 2008) ...................................................... 25

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
  554 F. Supp. 2d 1083 (C.D. Cal. 2008) ...................................................... 25

*In re Kindred Healthcare, Inc. Sec. Litig.*,
  299 F. Supp. 2d 724 (W.D. Ky. 2004) ........................................................ 25

*In re Level 3 Commc'ns Inc. Sec. Litig.*,
  2010 WL 5129524 (D. Colo. Dec. 10, 2010),
  *aff'd*, 667 F.3d 1331 (10th Cir. 2012) ........................................................ 7

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ........................................................ 5

*In re MELA Sciences, Inc. Sec. Litig.*,
  2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012) ............................................... 12

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re MRU Holdings Sec. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2012) ........................................................ 12

*In re NovaStar Fin. Inc. Sec. Litig.*,
   579 F.3d 878 (8th Cir. 2009) ..................................................................... 7

*In re Novastar Fin., Sec. Litig.*,
   2008 WL 2354367 (W.D. Mo. June 4, 2008),
   *aff'd*, 579 F.3d 878 (8th Cir. 2009) ......................................................... 22

*In re PetSmart, Inc., Sec. Litig.*,
   61 F. Supp. 2d 982 (D. Ariz. 1999) .......................................................... 11

*In re Pre-Paid Sec. Litig.*,
   No. CIV-01-0182-C (W.D. Okla. Mar. 5, 2002),
   *aff'd*, 189 F. App'x 702 (10th Cir. 2006) ............................................. 8, 20

*In re Radian Sec. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009) ........................................................ 25

*In re REMEC, Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) .................................................... 22

*In re Safeguard Scientifics*,
   2004 WL 2700291 (E.D. Pa. Nov. 18, 2004) ............................................ 17

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
   2007 WL 760535 (N.D. Cal. Mar. 19, 2007) ............................................ 25

*In re Sun Healthcare Grp., Inc. Sec. Litig.*,
   181 F. Supp. 2d 1283 (D.N.M. 2002) .................................................. 11, 23

*In re The First Marblehead Corp. Sec. Litig.*,
   639 F. Supp. 2d 145 (D. Mass. 2009) ....................................................... 24

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .......................................... 12

*In re United Telecom. Sec. Litig.*,
   781 F. Supp. 703 (D. Kan. 1991) ........................................................ 11, 22

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ...................................................................... 12

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ........................................................................ 25

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ...................................................... 12, 21

*Lane v. Page*,
  581 F. Supp. 2d 1094 (D.N.M. 2008) ............................................................ 23

*Lillard v. Stockton*,
  267 F. Supp. 2d 1081 (N.D. Okla. 2003) ........................................................ 9

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) ........................................................... 13

*McNamara v. Pre-Paid Legal Servs., Inc.*,
  189 F. App'x 702 (10th Cir. 2006) ........................................................... 6, 12

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ...................................................................... 10

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,
  2005 WL 4161977 (D. Colo. Oct. 20, 2005) ................................................. 23

*Oppenheimer v. Novell*,
  851 F. Supp. 412 (D. Utah 1994) .................................................................. 11

*Panter v. Marshall Field & Co.*,
  646 F.2d 271 (7th Cir. 1981) ........................................................................ 22

*Patel v. Parnes*,
  253 F.R.D. 531 (C.D. Cal. 2008) .................................................................... 7

*Prissert v. EMCORE Corp.*,
  2012 WL 4504512 (D.N.M. Sept. 28, 2012) ................................................... 8

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) ................................................................... 6, 10

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rombach v. Chang,*
　355 F.3d 164 (2d Cir. 2004) ........................................................................ 10

*Rosenweig v. Azurix Corp.,*
　332 F.3d 854 (5th Cir. 2003) ....................................................................... 23

*S.E.C. v. Kovzan,*
　807 F. Supp. 2d 1024 (D. Kan. 2011) ......................................................... 24

*Santa Fe Indus. Inc. v. Green,*
　430 U.S. 462 (1977) .................................................................................... 22

*Smith v. Circuit City Stores, Inc.,*
　286 F. Supp. 2d 707 (E.D. Va. 2003) ......................................................... 11

*Stamatio v. Hurco Cos.,*
　885 F. Supp. 1180 (S.D. Ind. 1995) ........................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
　551 U.S. 308 (2007) ........................................................................... 1, 6, 10

*Thornton v. Micrografx, Inc.,*
　878 F. Supp. 931 (N.D. Tex. 1995) ............................................................ 11

*Unicorn Fin.-Corp. v. First Union Real Estate & Mortg. Invs.,*
　515 F. Supp. 249 (S.D. Ohio 1981) ............................................................ 23

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.,*
　2008 WL 879023 (D. Colo. Mar. 28, 2008) ................................................. 9

*Ziemba v. Cascade Int'l, Inc.,*
　256 F.3d 1194 (11th Cir. 2001) .................................................................. 20

*Zucco Partners, LLC v. Digimarc Corp.,*
　552 F.3d 981 (9th Cir. 2009) ...................................................................... 25

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

## <u>STATUTES</u>

15 U.S.C.
  Section 78u-4(b)(1).............................................................................................5
  Section 78u-4(b)(2).............................................................................................5

17 C.F.R.
  Section 210.4-10...............................................................................................21
  Section 210.4-10(6)(i).......................................................................................21
  Section 229.303(a)(4).......................................................................................21
  Section 229.402...............................................................................................18
  Section 229.402(a)(6).......................................................................................18
  Section 229.403...............................................................................................18
  Section 229.404(a)...........................................................................................17
  Section 240.10(b)...............................................................................11, 21, 24
  Section 240.20(a)...............................................................................................25

## <u>OTHER AUTHORITIES</u>

Conf. Committee Joint Statement, H.R. Rep. No. 369, 104th Cong.,
  1st Sess., 41 Cong. Rec. H13692 (Nov. 28, 1995).........................................2

## <u>RULES</u>

Federal Rules of Civil Procedure
  Rule 9(b)...................................................................................................5, 7
  Rule 12(b)(6) ....................................................................................................5

## INTRODUCTION AND OVERVIEW

As the Supreme Court has repeatedly emphasized, securities class actions present "'a danger of vexatiousness different in degree and kind from that which accompanies litigation in general.'"[1]  Because such cases "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law,"[2] Congress rewrote the securities laws to ensure dismissal of stock drop complaints that fail to meet exacting pleading standards.  The Consolidated Class Action Complaint in this case (the "Complaint") falls far short of **all** of those standards.

Relying on a "puzzle pleading" formula condemned in the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), the Complaint intersperses a broad array of public statements and media reports during a three-year class period with a generic paragraph (*e.g.*, ¶¶ 132, 142, 159, 177) that purports to summarize the reasons why the statements collectively were false or misleading.  It does not identify the specific statements alleged to be actionable, or allege specific facts showing how and why each identified statement was materially false or misleading, as explicitly required by the Reform Act.

Plaintiffs' failure to allege "falsity" in accordance with legal requirements is dispositive, but the Complaint's wholesale failure to allege scienter is even more egregious.  It does not even **attempt** to plead specific highly particularized facts giving rise to a strong inference of fraudulent intent, as explicitly required by statute.  Apart from the absence of specificity, which is fatal, Plaintiffs are unable to plead a minimally coherent theory of fraud -- much less the strong and compelling one required under the Reform Act.

---

[1] *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189 (1994) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975)).

[2] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

Nothing in the interspersed generic paragraph, or anywhere else in the Complaint, demonstrates that any statement was made by any defendant with the requisite fraudulent intent. The Complaint says **nothing whatsoever** about the mental state of **any** of the individuals it blithely accuses of fraud, whether in connection with a specific statement or otherwise. Indeed, the first page of the Complaint effectively concedes that Plaintiffs are wholly **unable** to do so.

Ignoring statutory requirements and mountains of case law, the Complaint lumps all defendants together, and pronounces that they must have been aware of facts regarding Chesapeake's "core operations" solely "by virtue their positions" (*e.g.*, ¶¶ 29, 179). On that basis alone, Plaintiffs allege that defendants collectively knew "or should have known" (*e.g.*, ¶ 189) the "facts" purportedly misrepresented or concealed, which as demonstrated below, are not facts in any event.

Plaintiffs seek to excuse these glaring deficiencies by hypothesizing that "support" for their baseless accusations "will be revealed after a reasonable opportunity for discovery," and proclaiming that the facts so conspicuously absent from the Complaint "are known only by Chesapeake and the Individual Defendants." Compl. p. 1. That is precisely what Plaintiffs are **not** permitted to do. For good reason, the Reform Act forecloses such evasive tactics.

Congress sought to put an end to (1) "the routine filing of lawsuits…whenever there is a significant change in the issuer's stock price," (2) followed by "the abuse of the discovery process to impose costs so burdensome that it is often more economical for the victimized party to settle."[3] Accordingly, it required stock-drop plaintiffs to plead securities fraud **without** discovery, which is stayed until the complaint survives a motion to dismiss. Plaintiffs must satisfy the Reform Act's heightened pleading standards **now**. They do not get a pass based on the hope that discovery will reveal additional facts.

---

[3] Conf. Committee Joint Statement, H.R. Rep. No. 369, 104th Cong., 1st Sess., 41 Cong. Rec. H13692 (Nov. 28, 1995).

Even if the Complaint both satisfied the rules for pleading false statements, and included particularized scienter facts, it would still fail miserably.  As a perusal of their rambling allegations reveals, Plaintiffs are wholly unable to articulate a coherent theory of how and why defendants committed fraud.  Accordingly, the Complaint strains to manufacture one by cobbling together disparate parts abstracted from media reports criticizing corporate governance and management practices.  The parts do not add up to fraud, and are not actionable under the securities laws in any event.

Nor can Plaintiffs marshal **any** of the factors that are typically at the core of efforts to plead scienter.  In sharp contrast to virtually all securities class action claims brought under Section 10(b), the Complaint can cite no suspicious stock sales by insiders during the alleged class period, and no means through which the defendants would have profited by inflating the company's stock price via fraudulent misstatements.

Instead of selling stock, the individual defendants dramatically **increased** their Chesapeake holdings during the class period.  The company's Section 16(a) officers collectively increased their holdings exponentially,[4] and Messrs. McClendon and Dell'Osso, Jr. -- the company's CEO and CFO -- purchased nearly two million dollars worth of stock in the open market at prices purportedly inflated by their fraud.

Chesapeake did not offer or sell a single share of stock at any time during the alleged class period, and had no motive to commit securities fraud either.  There is no allegation of any financial restatement or correction of any SEC filing.  Despite the efforts invariably undertaken by plaintiffs' counsel to locate "confidential witnesses" to cite as providing information about the alleged fraud, the Complaint does not contain a single "CW" allegation.

Worse still, almost every significant "fact" that the Complaint **does** allege is dead

---

[4] As shown below, during the class period, Mr. McClendon's holdings increased by **48.95%,** Mr. Dell'Osso's holdings increased by **277.34%,** Mr. Johnson's holdings increased by **74.7%** and Mr. Hood's holdings increased by **61.46%.**

wrong, as the documents cited in the Complaint **themselves** demonstrate.  For example, the Founder Well Participation Program ("FWPP") did not enable Mr. McClendon to cherry pick wells or avoid acreage or exploration costs.  He paid his proportionate share of **all** of the costs associated with those wells, including all lease, exploration and production costs as required by the FWPP, and stood to benefit (or not benefit) on the same terms as the company.

Chesapeake did not "initiate a campaign" to tout the FWPP's alignment of his interests with the company's during the class period; the same statements on that subject had been consistently made in the same disclosure documents for years before. Mr. McClendon did not "acquire" the "entirety" of his FWPP interests through financing transactions during the class period; he began purchasing them in 1993.  Far from "having no skin in the game," he stands to suffer serious losses -- including upside -- if the well interests he purchased for hundreds of millions of dollars from 1993-2012 do not perform well.  As the SEC rules cited in the Complaint make clear, the loans were not related party transactions.  The company was not a party to Mr. McClendon's financing transactions in any way, shape or form, and there are no requirements that the company disclose information regarding Mr. McClendon's use of his separate personal property.

Similarly, despite Plaintiffs' repeated allusions to secretive "off balance sheet" transactions and concealment of debt, the volumetric production payment ("VPP") transactions were accounted for in strict conformance with GAAP, and were included in financial statements that were repeatedly audited by a big four accounting firm.  The VPPs do not constitute "debt" -- "concealed" or otherwise.  Nor is there any "liability" associated with them.  The only future obligations are the costs associated with producing the underlying natural gas and oil, and they were included in the production costs reported in the company's financial statements and in its financial guidance.  Chesapeake further disclosed an abundance of detailed information regarding each VPP transaction in its SEC filings, on conference calls, on its website and at webcast investor conferences.

# ARGUMENT

## I.    THE HEIGHTENED STANDARDS FOR PLEADING SECURITIES FRAUD

A plaintiff alleging securities fraud "bears a heavy burden at the pleading stage." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). Even before the Reform Act, "[c]ourts d[id] not hesitate to dismiss securities claims pursuant to Rule 12(b)(6)…where the plaintiff ha[d] failed to allege with particularity circumstances that could justify an inference of fraud under Rule 9(b)." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997). The Reform Act imposed far more rigorous pleading requirements, and mandates dismissal of complaints -- like this one -- that fail to measure up. *City of Phila. v. Fleming Cos., Inc. (Fleming III)*, 264 F.3d 1245, 1258-59 (10th Cir. 2001).

To survive a motion to dismiss, a Section 10(b) complaint must (1) specify each statement alleged to have been misleading and (2) the reasons why the statement is misleading. If, as in this case, the "falsity" allegations are made on information and belief, the complaint must state all facts on which the belief is based, with particularity. 15 U.S.C. § 78u-4(b)(1).

In addition to alleging falsity in conformance with those elevated standards, the complaint must "state with particularity facts giving rise to a strong inference" that the defendant(s) making the identified statement did so with scienter. 15 U.S.C. § 78u-4(b)(2). As defined by the Supreme Court, scienter under Section 10(b) requires "a mental state embracing intent to deceive, manipulate or defraud."[5] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

---

[5] It is not enough to plead particularized facts demonstrating "the defendant knew of the potentially material fact" -- a complaint must **also** specifically allege "the defendant knew that failure to reveal the potentially material fact would likely mislead investors," or the fact "was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Fleming III*, 264 F.3d at 1260.

Even when supported by particularized facts, an inference of fraudulent intent cannot be "strong" unless it is "cogent" and "compelling." *Tellabs*, 551 U.S. at 314. Importantly, the allegations of the Complaint must satisfy that requirement taking into account facts and inferences that undercut, rather than support, a strong inference of fraud. *Id.* at 324-25. Plaintiffs must therefore confront, and overcome, facts that are inconsistent with their unfounded accusations. When defendants acquired, rather than sold, stock at "inflated" prices, the inference that they engaged in securities fraud does not qualify as cogent, compelling or strong. *See, e.g.*, *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 718 (10th Cir. 2006) (affirming dismissal where allegations failed to demonstrate that fraud was "economically logical" in light of defendant's purchases of stock during period); *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) ("*Tellabs* instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of Tribune's stock fell.").

## II.    THE COMPLAINT'S "PUZZLE PLEADING" FORMULA MANDATES DISMISSAL

The Complaint makes no meaningful attempt to identify specific misstatements and state precisely how and why the identified statements are materially false or misleading, as required by statute. Instead, it provides a table listing twenty SEC filings that supposedly contain false or misleading statements (Compl. ¶ 121), selectively quotes out-of-context portions of some of those filings, of press releases, conference call transcripts and news articles (*see, e.g.*, *id.* ¶¶ 122-31, 133-41, 143-58, 160-76), and then, without identifying which specific statements were supposedly false or misleading, offers a conclusory list of supposed "true facts" that were purportedly misrepresented. *Id.* ¶¶ 132, 142, 159, 177-78.

As numerous cases have held, that approach cannot be reconciled with the plain language of the Reform Act. *See, e.g., In re Level 3 Commc'ns Inc. Sec. Litig.*, 2010 WL

5129524, at *9 (D. Colo. Dec. 10, 2010), *aff'd*, 667 F.3d 1331 (10th Cir. 2012); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005); *In re NovaStar Fin. Inc. Sec. Litig.*, 579 F.3d 878, 883 (8th Cir. 2009); *City of Pontiac Emp. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1293 (N.D. Ga. 2011).  Adding italics to portions of block quotes does nothing to remedy this core defect.  *See, e.g., In re Downey Sec. Litig.*, 2009 WL 2767670 at *3 (C.D. Cal. Aug. 21, 2009); *Patel v. Parnes*, 253 F.R.D. 531, 552 n.192 (C.D. Cal. 2008).  The Tenth Circuit has recently joined the chorus rejecting Plaintiffs' "puzzle pleading" tactic.  *Level 3*, 667 F.3d at 1339 n.8.

## III.   THE COMPLAINT FAILS TO ALLEGE PARTICULARIZED FACTS DEMONSTRATING FRAUDULENT INTENT

If the Complaint survived the Reform Act's requirements for pleading false statements, it would collide head on with the statute's scienter standards, and Rule 9(b). Plaintiffs' 80 page Complaint is completely devoid of the requisite particularized allegations giving rise to a strong inference that any defendant made any statement with anything resembling an "intent to deceive, manipulate or defraud."  Rather, the Complaint attempts to "**impute**" the **conclusion** of scienter (1) as to the **entirety** of a mish-mash of disparate, out-of-context quotes, (2) to **all** defendants on the basis that facts concerning  "Chesapeake's 'core operations' are **presumably** known by its key officers," who "by virtue of their positions…were privy to…information concerning Chesapeake and its business, operations, growth, financial statements, and financial condition, as alleged herein."  Compl. ¶ 29; *see id.* ¶¶ 170-83.[6]  The gulf between such allegations and

---

[6] The Complaint's "core operations" allegations are presented as "Additional Scienter Allegations."  Compl. ¶¶ 179-183.  But defendants can identify only **five** other paragraphs in the Complaint that contain averments of scienter.  One of them repeats verbatim the "core operations" allegations (*id.* ¶ 29), one is blatant speculation (*id.* ¶ 89 ("McClendon's personal financing **appears to be** a *quid pro quo* for the Company's business") (emphasis added)), one attempts to found scienter on purportedly false statements alone (*id.* ¶ 186), and the other two offer conclusory statements without any corroborating factual support.  *See id.* ¶ 81 ("McClendon's secret debts explain…why [he] drove Chesapeake to incur massive acquisition and drilling costs"), ¶ 92 (McClendon drove "the Company to incur unnecessary acquisition and drilling costs…to

the plain language of the Reform Act is obviously vast. While further explication is unnecessary, it reveals layers of specific defects.

Without any corroborating facts, such conclusory allegations are patently insufficient to state a fraud under the Reform Act. *See, e.g.*, *Caprin v. Simon Transp. Servs., Inc.*, 99 F. App'x 150, 164 (10th Cir. 2004).[7] Group allegations are, by definition, not specific, and thus cannot give rise to a strong inference of scienter under the Reform Act.[8] Nor does the Complaint make the slightest effort to plead anything -- much less specific corroborating details -- that might support its boilerplate assertion that this group of defendants acted with fraudulent intent. It does not reference any meeting attended by any defendant, any internal report he received or reviewed, any internal email, or any information of any kind purportedly provided by any "confidential witness." Plaintiffs' silence on those points is deafening -- and **fatal**.

In addition to being directly at odds with statutory requirements, attempts to allege scienter based on management positions and involvement in the company's operations have long been resoundingly rejected by the courts -- including this one. *See, e.g.*, *City of Phila. v. Fleming Cos., Inc. (Fleming I)*, No. CIV-96-853-M, slip op. at 16 (W.D. Okla. Mar. 4, 1999) (Miles-LaGrange, J.) ("Plaintiffs simply make conclusory allegations that defendants were senior officers; therefore, they had actual knowledge or should have had knowledge of the 'true facts.' Such conclusory allegations of scienter are not sufficient

---

satisfy his collateral obligation with future Chesapeake wells"). These are the **sum total** of the Complaint's scienter allegations.

[7] *See also In re Pre-Paid Sec. Litig.*, CIV-01-0182-C, slip op. at 8 (W.D. Okla. Mar. 5, 2002) (Cauthron, J.) (dismissing Section 10(b) case because "Plaintiffs are required under the PSLRA to show a court when, where, and how a fraud was perpetrated"), *aff'd*, 189 F. App'x 702, 718 (10th Cir. 2006). Slip opinions issued by this Court are attached as exhibits 34-36 to defendants' accompanying Request for Judicial Notice and Consideration of Documents in Support of Defendants' Motion to Dismiss ("RJN"). "Ex. __" refers to exhibits attached to the RJN.

[8] *See, e.g., Prissert v. EMCORE Corp.*, 2012 WL 4504512, at *9 (D.N.M. Sept. 28, 2012) ("The PSLRA's particularity requirements, however, 'foreclose plaintiffs from pleading that facts about the defendants, as a group, are sufficient to give rise to a strong inference of scienter.'").

under Rule 9(b), much less under the PSLRA."); *City of Phila v. Fleming Cos., Inc. (Fleming II)*, 2000 U.S. Dist. LEXIS 21427, at *28-29 (W.D. Okla. Feb. 4, 2000) (Miles-LaGrange, J.) (rejecting conclusory "scienter allegation based upon a defendant's position as an officer at Fleming"), *aff'd*, 264 F.3d 1245 (10th Cir. 2001).

"Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company." *Fleming III*, 264 F.3d at 1264.  The Reform Act requires Plaintiffs to allege particularized scienter facts as to each individual defendant, not defendants in the aggregate. *See, e.g., Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1108 (N.D. Okla. 2003) (dismissing complaint where allegations "fail[ed] to distinguish among any of the Defendants in attributing scienter"); *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 879023, at *14 (D. Colo. Mar. 28, 2008) ("Common pleading does not satisfy the particularity requirements of the statute, and the alleged scienter of each defendant must be separately considered.").  The Complaint's abject failure to plead specifics showing **how** the individual defendants knew the "truth" about facts that were purportedly misstated mandates dismissal. *See, e.g., In re Chesapeake Energy Corp. Sec. Litig.*, CIV-97-1360, slip op. at 19 (W.D. Okla. Mar. 3, 2000) (Leonard, J.); *Fleming I*, CIV-96-853-M, slip op. at 16.

## IV.   THE COMPLAINT FAILS TO ALLEGE A COMPELLING THEORY OF FRAUD

In addition to lacking any semblance of particularized "factual" support, the Complaint fails to provide anything resembling a compelling theory of fraud.  That is true for three core reasons.  First, Plaintiffs are unable to marshal any of the indicia of securities fraud, and judicially noticeable facts affirmatively refute any inference of fraudulent intent.  Second, the Complaint is constructed from disparate pieces that do not fit together in a coherent whole, or support a strong inference of scienter.  Third, in addition to not fitting together, the disparate pieces are individually defective.

9

A.    **PLAINTIFFS CANNOT ALLEGE ANY INDICIA OF SECURITIES FRAUD**

Viable securities fraud complaints have key elements that together support a strong inference of fraud.  This Complaint does not have a **single one** of them.  There are no allegations  "(1) concerning a financial restatement . . .; (2) of auditor resignations; (3) that the company violated accounting standards or 'cooked its books'; (4) that suspiciously-timed inside stock sales occurred; (5) that a corrective disclosure was made; [or] (6) concerning what motive Defendants had to defraud the public."  *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1358-59 (N.D. Ga. 2010) (dismissing complaint that lacked such indicia of fraud).  Such a "lack of indicia of fraud…refutes any inference that each Defendant acted with the requisite intent to deceive."  *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1323 (S.D. Fla. 2004).

Indeed, there are legions of cases that analyze, debate and dismiss Section 10(b) claims despite combinations of a major financial restatement,[9] millions of dollars of stock sales by insiders during the class period,[10] and strong incentives to inflate the company's stock price in connection with a merger or securities offering.[11]  Because all such factors are conspicuously absent here, Plaintiffs cannot even **get into** such a contest.

B.    **ANY INFERENCE OF FRAUD IS AFFIRMATIVELY REFUTED BY THE ACQUISITION OF STOCK DURING THE CLASS PERIOD**

Plaintiffs' inability to allege suspicious sales of Chesapeake stock during the alleged class period devastates any inference of fraud.  *See, e.g.*, *Pugh*, 521 F.3d at 695 ("*Tellabs* instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of Tribune's stock fell").  As the court in *Thornton v.*

---

[9] *See, e.g.*, *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783 (11th Cir. 2010)

[10] *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049 (9th Cir. 2008).

[11] *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004).

*Micrografx, Inc.,* 878 F. Supp. 931 (N.D. Tex. 1995), pointedly emphasized: "Why would the Defendants expend so much time and effort to conceal facts and misrepresent information … [without] enjoying the fruits of their fraud by selling their stock?" *Id.* at 938.

A multitude of cases dismissing Section 10(b) claims have underscored the point that securities fraud claims make little sense when the insiders fail to sell substantial amounts of stock at the prices plaintiffs allege were inflated by their fraud. *See, e.g.*, *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006) (noting that "dozens of cases dismiss[] complaints on scienter grounds where…stock sales were found to be *de minimis* or [where] motive allegations were undermined by increases in total holdings"); *Andropolis v. Red Robin Gourmet Restaurants, Inc.*, 505 F. Supp. 2d 662, 678 (D. Colo. 2007) ("[T]he inference of scienter in this case is particularly weak given that Plaintiff does not allege inside stock sales intended to take advantage of Red Robin's purportedly intentional inflation of earnings.").[12]

In this case, the insiders dramatically **increased** their stock holdings, rather than bailing out of the stock or seeking to profit from a purported fraud, which is "a fact wholly inconsistent with fraudulent intent."[13] *In re Bristol-Myers Squibb Sec. Litig.*, 312

---

[12] *See, e.g., In re Sun Healthcare Grp., Inc. Sec. Litig.,* 181 F. Supp. 2d 1283, 1296 (D.N.M. 2002); *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 716 (E.D. Va. 2003); *Brogren v. Pohlad*, 933 F. Supp. 793, 799 (D. Minn. 1995); *Oppenheimer v. Novell*, 851 F. Supp. 412, 418 (D. Utah 1994); *Stamatio v. Hurco Cos.*, 885 F. Supp. 1180, 1184 (S.D. Ind. 1995); *In re United Telecom. Sec. Litig.,* 781 F. Supp. 703 (D. Kan. 1991); *In re PetSmart, Inc., Sec. Litig.*, 61 F. Supp. 2d 982, 1000 (D. Ariz. 1999).

[13] During the class period, Mr. McClendon's holdings increased by **48.95%,** Mr. Dell'Osso's holdings increased by **277.34%**, Mr. Johnson's holdings increased by **74.7%** and Mr. Hood's holdings increased by **61.46%**. *See* Exs. 1, 6 (indicating that as of 4-2-09, the date of the last Form 4 filed before the start of the class period, McClendon held 2,186,993 shares, and as of 4-3-12, the date of the last Form 4 filed during the class period, he held 3,257,614 shares); Exs. 7, 10 (indicating that as of 11-9-10, the date of the first Form 3 filed by Dell'Osso, he held 94,203 shares, and as of 4-3-12, the date of the last Form 4 filed during the class period, he held 355,471 shares); Exs. 11-12 (indicating that as of 4-2-09, the date of the last Form 4 filed before the start of the class period, Johnson held 285,405 shares, and as of 4-3-12, the date of the last Form 4 filed during the class period, he held 498,621 shares); Exs. 13-14 (indicating that as of 4-2-09, the date of the last Form 4 filed before the start of the class period, Hood held 444,860 shares, and as

F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *see, e.g.*, *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2012) ("Plaintiffs cannot present 'strong circumstantial evidence of conscious misbehavior or recklessness' where…Defendants…increased their holdings."); *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 572-73 (E.D. Pa. 2009) ("Defendants not only held onto their shares…during the Class Period, they actually increased their holdings incrementally throughout the Class Period.  Such conduct raises a compelling inference *against* scienter." (emphasis in original)).

Moreover, Mr. McClendon and Chesapeake's CFO, who according to Plaintiffs' accusations would have been directly involved in the alleged wrongdoing, together purchased nearly two million dollars of Chesapeake stock on the open market.[14]  That fact is similarly decisive.  *See, e.g.*, *Druskin*, 299 F. Supp. 2d at 1336 n.40 (fact that "the CEO, who held a significant amount of shares and who would have been an essential participant in any fraudulent scheme, did not sell stock undermines any suggestion" of scienter); *In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) ("[T]he fact that FVC's President and CEO…did not sell any of his stock…negates any slight inference of scienter."), *aff'd*, 32 F. App'x 338 (9th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094 (9th Cir. 2002) ("In his position as CEO and as the person most quoted in the complaint, Luongo was presumably in the best position to know the 'true' facts.  Yet his trading percentage belies any [fraudulent] intent").[15]

---

of 4-3-12, the date of the last Form 4 filed during the class period, he held 718,275 shares).

[14] *See* Exs. 2-5, 8-9.

[15] *See, e.g.*, *McNamara*, 189 F. App'x at 718; *In re MELA Sciences, Inc. Sec. Litig.*, 2012 WL 4466604, at *6 (S.D.N.Y. Sept. 19, 2012) ("[A]ny finding of a strong circumstantial evidence of conscious misbehavior or recklessness is negated by defendants' purchase, and holding, of MELA shares throughout the class period."); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 594 (E.D. Va. 2006) ("The fact that a defendant acquires stock during a class period further negates any idea that Defendants had a motive to commit fraud."); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *13 (S.D.N.Y. Sept. 28, 2012) (dismissing complaint because "repurchasing stock at a knowingly inflated price would be economically irrational"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 152 (D. Conn. 2007) (fact

### C.   PLAINTIFFS' FRAUD ACCUSATIONS FAIL BECAUSE THEY ARE COBBLED TOGETHER FROM DISPARATE PARTS

This is not a scienter case constructed of parts that fit together in a unified whole and support a strong inference of scienter -- for example, a major financial restatement preceded by suspicious insider sales, coupled with CW information suggesting that defendants were cooking the books.  It is a clumsy attempt to transform far-flung media criticisms into a securities fraud complaint comprised of disjointed parts -- including unfounded assertions related to VPP transactions, the FWPP, purported related party transactions and conflicts of interest, liquidity challenges and a hodge-podge of odds and ends.  Even if the individual pieces were well grounded and supported by particularized allegations, they would not add up to a cogent and compelling inference of fraud, especially in the absence of suspiciously timed insider sales, a major restatement or confidential witness allegations.

### D.   THE UNDERLYING CLAIMS ARE DEMONSTRABLY FALSE

It is not just that the Complaint lacks particularized factual support, has none of the factors typically cited in Section 10(b) complaints, and lacks a unified and compelling theory of fraud.  The pieces from which the Complaint is assembled are also **individually** defective.  Nearly all of its operative assertions are refuted by the very documents it cites, which are properly before the Court on this motion.

#### 1.   THE FWPP ALLEGATIONS ARE REFUTED BY THE DOCUMENTS CITED IN THE COMPLAINT

The Complaint's misconceived allegations regarding the FWPP fall into two basic categories: purported misstatements about "alignment of interests," and an alleged failure to disclose "related party" transactions.  Plaintiffs asserts that (1) during the class period Chesapeake "initiated a campaign to convince shareholders" that the FWPP aligned Mr. McClendon's interests with the company's interests, but the FWPP failed to accomplish

---

that CFO increased his total holdings and purchased shares in the open market was "wholly inconsistent with fraudulent intent").

such alignment because McClendon supposedly, (2) did not share in the costs of acquiring and exploring the land on which wells were drilled, and (3) had no "downside" or "skin in the game" because he had acquired his FWPP interests pursuant to "non-recourse" financing transactions that used the FWPP assets as collateral.  Compl. ¶¶ 42-45.  As the documents cited in the Complaint make clear, none of those three assertions is correct.

Plaintiffs further allege that the financing transactions through which Mr. McClendon purportedly acquired "the entirety of his FWPP interests" constituted related party transactions.  *Id.* ¶¶ 45-56.  Those assertions are similarly refuted by documents cited in the Complaint.

### a.   PLAINTIFFS' "ALIGNMENT" ALLEGATIONS ARE BASELESS

As demonstrated at pages 22-24 below, statements expressing Chesapeake's opinion that the FWPP aligns the interests of Mr. McClendon and the company are -- as a matter of law -- not actionable under the securities laws.  Even if that were not the case, Plaintiffs' FWPP claims would fail because they are baseless from beginning to end.

According to the Complaint the FWPP program was the "centerpiece" of a "campaign" started in 2009 to reassure shareholders and "tie McClendon's principal compensation to the Company's gas and oil wells."  *Id.* ¶ 41.[16]  In fact, Mr. McClendon's well participation began in 1993, and the FWPP in 2005.  Ex. 15 at 13-16; Ex. 16 at 46-47.  Chesapeake does not consider the FWPP a form of compensation in that McClendon

---

[16] The alleged "campaign" was purportedly the result of Chesapeake having to "bail out McClendon."  Compl. ¶ 39.  Allegations that Chesapeake improperly "bailed out" Mr. McClendon were raised in two shareholder lawsuits filed in Oklahoma state courts in 2009, both of which were dismissed.  *La. Police Emp. Ret. Sys. v. Chesapeake Energy Corp.*, Case No. CJ-2009-2870, filed March 26, 2009, and *In re Chesapeake S'holder Litig.*, Case No. CJ-2009-3983, filed April 28, 2009.

is required to pay for his FWPP interests, and his FWPP costs have thus far exceeded revenues by a wide margin.[17]

Nor were the company's statements regarding its belief that the FWPP aligns the interests of Chesapeake and Mr. McClendon made as part of a "campaign" "initiated" during the class period. That component of the Complaint's fraud theory is directly refuted by the fact that the same basic statements were made in the company's SEC filings for many years prior to the alleged class period. Ex. 15 at 13-16; Ex. 16 at 46-47; Ex. 17 at 50-51; Ex. 18 at 51-53; Ex. 19 at 60-62.

Plaintiffs' claims that the FWPP failed to align interests because Mr. McClendon purportedly does not bear a proportionate share of acquisition and exploration costs, and "is responsible for costs only if a well was successfully drilled" (Compl. ¶¶ 6, 82), are particularly egregious. According to the Complaint, this supposed free ride gave McClendon incentives not shared by the company, and precipitated a "land grab" strategy that created liquidity problems. *Id.* ¶¶ 5-6. But as the SEC filings cited in the Complaint make clear, there was no free ride, no ability to cherry pick wells, and no misalignment of interests:

- Mr. McClendon participated in all wells, successful or not: "*[I]f Mr. McClendon elects to participate in the FWPP, he must participate in all wells spudded by or on behalf of the Company during the given calendar year and cannot elect to participate on a well-by-well basis.*" (Ex. 19 at 61 (emphasis in original)).

- He is also required to pay **all** costs associated with the wells as set forth in the FWPP, including the costs of acquiring the land and conducting

---

[17] *See, e.g.*, Ex. 15 at 14 (noting in 2005 that "participation expenditures have exceeded revenue to date"); Ex. 18 at 53 (in 2010: "Mr. McClendon's cumulative expenditures under the FWPP and predecessor programs have significantly exceeded cumulative monthly production revenues to date"); Ex. 23 at 40 (in 2011: "[s]ubstantial front-end investments of capital are required to drill oil and natural gas wells, and Mr. McClendon's capital investment has continued to increase as the Company's capital expenditures have increased over the years."). Chesapeake reported that Mr. McClendon had negative net cash flows of $116,093,575 in 2009, $141,877,012 in 2010, and $315,337,312 in 2011. Ex. 23 at 40.

exploration activities -- not just the cost of drilling and production. *Id.*[18]

The Complaint's assertions that Mr. McClendon participates "only in the good acreage," "gets better opportunities," and shares in the "boons" while avoiding the "banes" (Compl. ¶ 82), are thus entirely baseless. Moreover, if there was a "land grab" strategy, it could not possibly have had anything to do with any divergence of interests between McClendon and Chesapeake. Nor, as the Complaint itself acknowledges (*id.* ¶ 59), did such a strategy begin during the class period.

Equally bogus is Plaintiffs' assertion that "McClendon did not put any of his personal assets at risk" in entering into the loans, and thus has no "skin in the game." *Id.* ¶¶ 5, 47. As Chesapeake's SEC filings make clear, Mr. McClendon accumulated his FWPP assets over many years, beginning in 1993.[19] They were not "acquired" in their "entirety" via financing transactions during the class period, as alleged in the Complaint. *Id.* ¶¶ 41, 46. The FWPP interests are McClendon's personal assets, and he has spent millions of dollars each year to acquire and maintain them.[20] The prospect of losing his FWPP interests, and all of the upside associated with them, certainly counts as "skin in the game."

Under settled law, Chesapeake was not required to disclose the fact that Mr. McClendon used his FWPP holdings as collateral because they are "his personal

---

[18] "The FWPP provides that the amount paid by Mr. McClendon for acreage assigned in connection with his participation in the FWPP is to be recomputed as of the first day of each calendar year and is equal to a fully costed average per acre amount computed as follows: (i) **direct costs** capitalized in the appropriate accounting pool in accordance with the Company's accounting procedures (**including all capitalized interest, leasehold payments, acquisition costs, landman charges and seismic charges**); divided by (ii) the acreage in the applicable pool at the time of computation. The annual computation allows the Company to reflect the acreage and costs with respect to newly acquired acreage; acreage sold by the Company and acreage that has expired. All other costs are billed in accordance with the Company's accounting procedures…and such amounts paid by Mr. McClendon…is on no better terms than the terms agreed to by unaffiliated third party participants…." Ex. 18 at 52; Ex. 19 at 61 (emphasis added).

[19] Ex. 15 at 13-14; Ex. 19 at 60, 62.

[20] *See* Compl. ¶ 3; Ex. 18 at 53; Ex. 19 at 62.

assets…separate and distinct from the Company's interest[s]."[21]  *See, e.g.*, *In re Safeguard Scientifics*, 2004 WL 2700291, at *2 (E.D. Pa. Nov. 18, 2004) (company was under no duty to disclose "information regarding [CEO's]…financial liabilities"); *City of Omaha Emp. Ret. Sys. v. CBS Corp.*, 2010 WL 1029290, at *13 (S.D.N.Y. Mar. 16, 2010) (no duty to disclose chairman's personal loan that was made "by third parties" and was not secured by company assets).[22]  Chesapeake nevertheless made clear that the "FWPP does not restrict [McClendon's] sales, other dispositions or financing transactions involving FWPP interests."  Ex. 17 at 64; Ex. 18 at 52-53; Ex. 19 at 62.  Chesapeake further disclosed, throughout the class period, that McClendon "sold FWPP interests in conjunction with sales by the Company" and made "personal financing transactions…with respect to certain of his interests in the Company's wells."[23]  Ex. 17 at 51, 64-65; Ex. 18 at 39, 53; Ex. 19 at 62.

### b.   PLAINTIFFS' "RELATED PARTY" ALLEGATIONS ARE BASELESS

Plaintiffs play equally fast and loose in attempting to allege the existence of "related party" transactions.  Compl. ¶¶ 49-56.[24]  As the Complaint itself acknowledges, a related party disclosure obligation arises only when there is a "transaction" in which "the registrant is a participant," and "in which any related person had or will have a direct

---

[21] Ex. 18 at 52-53; Ex. 19 at 62.

[22] Companies are not required to disclose information regarding their officers' and directors' personal finances.  *See, e.g.*, *In re Donald Trump Casino Sec. Litig.*, 793 F. Supp. 543, 564-65 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993); *Safeguard Scientifics*, 2004 WL 2700291, at *2; *Burekovitch v. Hertz*, 2001 WL 984942, at *9-10 (E.D.N.Y. July 24, 2001); *City of Omaha*, 2010 WL 1029290, at *13; *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 971 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del.  2004).

[23] Indeed, the Complaint relies on an article that plainly states:  "[I]nvestors **have known for years** that McClendon has borrowed against or sold portions of his stakes."  Ex. 31 at 3 (emphasis added).

[24] Item 404(a) of Reg. S-K requires "the registrant" -- in this case, Chesapeake -- to describe transactions with "any related person[s]," which are defined in the instructions to include "any director or executive officer of the registrant," their immediate family members, and five- percent shareholders.

material interest." *Id.* ¶ 52.  Here, there are **no** allegations that Chesapeake (1) entered into a lending transaction with Mr. McClendon or (2) was a party to McClendon's personal transactions with third party lenders.[25]  Nor could there be.  Plaintiffs' related party allegations are, once again, baseless.  *See, e.g., City of Omaha*, 2010 WL 1029290, at *13 (rejecting argument that CBS was required to disclose its chairman's personal loans where there was "no allegation that CBS extended or guaranteed [a] loan" made "by third parties to [chairman]-related interests").

The Complaint's attempt to shoehorn the FWPP program into disclosure rules aimed at equity compensation (Compl. ¶ 57) is also far wide of the mark.  Plaintiffs assert that Items 402 and 403 of Reg. S-K required "Defendants to disclose McClendon's FWPP interests that have been used as collateral."  *Id.*  But, as the language cited in the Complaint makes clear, Items 402 and 403 govern "disclosures of executive compensation," and, more specifically, "restricted **stock** and other non-option **equity awards**."  *Id.* (emphasis added).  Mr. McClendon's FWPP interests in wells are not "executive compensation" because he must pay for them, and has yet to attain positive cash flow as a result of the expenditures.  Ex. 17 at 63-64.  More important, they are obviously not "stock," "shares" or any type of "equity award."  *See* 17 C.F.R. § 229.402(a)(6) ("The term *equity* is used to refer generally to stock and/or options.").  Plaintiffs' assertions on this point typify the Complaint's efforts to pound square pegs into round holes.

## 2.   THE VPP ALLEGATIONS ARE BASELESS

Plaintiffs' allegations that Chesapeake misstated its VPPs (Compl. ¶¶ 72-159) are similarly refuted by the documents it cites and others properly before the Court on this

---

[25] Chesapeake is alleged to have had transactions with the same third parties at other times (Compl. ¶ 49), but those transactions are not alleged to have included Mr. McClendon or another related party to Chesapeake.

motion.[26]  The VPP assertions are based on the false premise that the VPPs are secretive

transactions that conceal debt.  In fact, the VPPs are sale transactions that are reflected on

the balance sheet at the time of the sale, as dictated by GAAP and SEC rules.  They do

not constitute debt, and there **is no** debt or liability to place on the balance sheet.  The

only future obligation or expense is production costs that will be incurred if and when oil

or natural gas is produced and delivered to the VPP counterparty.[27]  *See, e.g.*, Ex. 20 at 26

(VPP is sold "free and clear of all associated future production costs and capital

expenditures" but is otherwise "nonrecourse to the seller," Chesapeake).

At the time of the VPP sale, the value of proved reserves on the balance sheet is

reduced by the amount of cash received, which is also reflected on the balance sheet.

*See, e.g.*, Ex. 21 at 111-12; Ex. 22 at 154-55.  The associated operating costs are included

in the company's financial statements and projected into guidance, along with all of the

company's other production costs.[28]

Moreover, the Complaint's attempt to cast the VPPs as vehicles of concealment is

refuted by voluminous information beyond Chesapeake's financial statements, and the

---

[26] A VPP "is a limited-term overriding royalty interest in natural gas and oil reserves that (i) entitles the purchaser to receive scheduled production volumes over a period of time from specific lease interests; (ii) is free and clear of all associated future production costs and capital expenditures; (iii) is non-recourse to the seller (i.e., the purchaser's only recourse is to the reserves acquired); (iv) transfers title of the reserves to the purchaser; and (v) allows the seller to retain the remaining reserves, if any, after the scheduled production volumes have been delivered."  Ex. 20 at 26.

[27] Moreover, the notion that the VPPs undermined the company's debt reduction plan (*see, e.g.*, Compl. ¶¶ 11-13, 132) is demolished by the fact that the company "has sold approximately 1.37 trillion cubic feet of natural gas equivalent (tcfe) of proved reserves [via VPPs] for combined proceeds of approximately $6.4 billion, or approximately $4.65 per mcfe, which is approximately **300% more** than the company's current drilling and completion cost per mcfe."  Ex. 29 (emphasis added).

[28] *See, e.g.*, Ex. 32 at 2; Ex. 30 (noting that updated guidance includes "estimated production decreases…in 2013 associated with potential…VPP and other monetization transactions"); Ex. 24 (updating forecast based in part on new VPP); Ex. 25 (noting that "guidance has been updated to reflect…anticipated [VPP] transactions in 2009 and in 2010"); Ex. 26 (same); Ex. 27 (updating forecast based on updated "asset monetization projections" and cost assumptions); Ex. 28 (noting that updated guidance has incorporated "the anticipated closing of VPP #9," "increased drilling and completion costs" and updated "[c]ost assumptions").

frequent discussions about VPPs on investor and analyst calls. The detailed information disclosed in connection with VPPs includes, for each of the VPPs, the date of the transaction, the region, the dollar amount of the proceeds received (reflected on the balance), the volume of proved reserves to be delivered (subtracted from proven reserves on the balance sheet), the period over which such volumes are to be produced, and the fact that Chesapeake bears the cost of the production costs associated with the VPP. Ex. 20 at 133; Ex. 21 at 115; Ex. 22 at 160. Chesapeake's SEC filings throughout the class period also disclosed detailed explanations showing the reduction from proved reserves attributable to VPPs during the applicable period. *See, e.g.*, Ex. 20 at 128-29; Ex. 21 at 111-12; Ex. 22 at 154-55.

Under long-settled law, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. … Only where such allegations are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim." *Fleming III*, 264 F.3d at 261; *see, e.g.*, *Chesapeake*, No. CIV-97-1360-L, slip op. at 22.[29] That is true even when -- as is **not** the case here -- there is a major restatement.

As Judge Cauthron emphasized in *Pre-Paid Legal*, a case that involved a large restatement, disagreements over application of complex accounting principles provide a poor platform on which to allege securities fraud. *See In re Pre-Paid Sec. Litig.*, No. CIV-01-0182-C, slip op. at 12, 14-16 (W.D. Okla. Mar. 5, 2002), *aff'd*, 189 F. App'x 702 (10th Cir. 2006). Such allegations can succeed **only** when the violations of GAAP or SEC rules "were the result of the defendant's fraudulent intent to mislead investors." *Id.*

---

[29] *See, e.g.*, *Day v. Staples, Inc.*, 555 F.3d 42, 57 (1st Cir. 2009) ("A generalized allegation of inaccuracy in accounting is insufficient to establish a reasonable belief in a violation of GAAP, much less a reasonable belief in shareholder fraud."); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208 (11th Cir. 2001) ("[A]llegations of violations of GAAS or GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b).").

at 12 (quoting *Fleming III*, 264 F.3d at 261).  Accordingly, there could be no Section 10(b) claim here even if there were a problem with the manner in which Chesapeake accounted for the VPPs, but there was no such problem.

Chesapeake indisputably accounted for the VPPs appropriately in accordance with Rule 4-10 of Reg. S-X, which governs financial accounting and reporting for oil and gas producing activities accounted for under the full cost method, because it reported the cash proceeds from these transactions as a reduction of natural gas and oil properties with no gain or loss recognized, and reduced its proved reserves.  *See* 17 C.F.R. § 210.4-10(6)(i); *see, e.g.*, Ex. 21 at 115 ("For accounting purposes, cash proceeds from [VPP] transactions were reflected as a reduction of natural gas and oil properties with no gain or loss recognized, and our proved reserved were reduced accordingly.").

Plaintiffs' attempt to invoke Section 401(a) of the Sarbanes-Oxley Act ("SOX") and Item 303(a)(4) of Reg. S-K (Compl. ¶¶ 72-75) is similarly meritless, because (among other things)  Item 303(a)(4), the implementing rule for Section 401(a), is confined to a specific definition of "off-balance sheet arrangements" that has no application here.[30]

Not surprisingly, neither the SEC nor the company's outside auditors has suggested Chesapeake needs to restate its financial statements.[31]  That fact further demolishes Plaintiffs' attempts to plead falsity based on the VPPs.  *See, e.g.*,

---

[30] Item 303(a) defines an "off-balance sheet arrangement" as any transaction with an unconsolidated entity, under which the reporting company has: (1) any obligation under certain guarantee arrangements as identified in FASB ASC paragraph 460-10-15-4 (*e.g.*, guarantees of the indebtedness of others, indemnification agreements); (2) a retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to the entity; (3) any obligation under a derivative instrument that is both indexed to the company's own stock and classified as stockholders' equity in the balance sheet; or (4) any obligation arising out of a material variable interest held by the company in an unconsolidated entity that provides financing, liquidity, market or credit risk support to, or engages in leasing, hedging or research and development services with, the company.  17 C.F.R. § 229.303(a)(4)(ii)(A)-(D).  VPP transactions do not fall into any of those categories.

[31] Indeed, in determining what the proper accounting for the VPPs should be, Chesapeake followed the guidance given in its outside auditor's (PwC) publication, "Petroleum Accounting – Principles, Procedures & Issues."  Ex. 33 at 10.

21

*Ironworkers*, 432 F. Supp. 2d at 588 (dismissing complaint where "neither the SEC nor any other entity has called for a restatement"); *In re Novastar Fin., Sec. Litig.*, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) (same), *aff'd*, 579 F.3d 878 (8th Cir. 2009).

The absence of a restatement and repeated issuance of unqualified audit opinions[32] covering the challenged accounting are also "'highly probative' of an absence of scienter." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007); *see, e.g.*, *In re REMEC, Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1465 (N.D. Cal. 1996).

## V.   CLAIMS OF SECURITIES FRAUD CANNOT BE BASED ON GENERALIZED STATEMENTS OR CORPORATE MISMANAGEMENT

Much of what Plaintiffs complain about can best be described as criticisms of Chesapeake's management and corporate governance policies.  But a failure to disclose corporate mismanagement, even when it exists, is not actionable under the securities laws. *See, e.g., Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 474-77 (1977).  "[I]f the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law," *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981), and plaintiffs cannot evade this rule by "artful legal draftsmanship," *United Telecomm.*, 781 F. Supp. at 699 (citations omitted).  That black-letter rule affirmatively nullifies, among other things, Plaintiffs' criticisms of the company's disclosures regarding its debt-reduction strategy (Compl. ¶¶ 122-32), purported conflicts of interest, and criticisms of Chesapeake's "internal controls" and corporate governance.[33]  *Id.* ¶¶ 160-177.

---

[32] *See* Ex. 20 at 78; Ex. 21 at 68; Ex. 22 at 97.

[33] The *Andropolis* decision is instructive.  The plaintiff in that case, like Plaintiffs here, alleged "that repeated representations in Red Robin's Form 10-Q's and press releases that management had evaluated the Company's disclosure and financial reporting controls and found them to be effective were false and misleading when made." 505 F. Supp. 2d at 683.  The court held that "the 'central thrust' of Plaintiff's allegations concerning Red Robin's corporate deficiencies allege no more than corporate

Nor can Plaintiffs premise a securities claim on generalized opinions or statements of optimism. "Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Grossman*, 120 F. 3d at 1119. For example, Plaintiffs' quibble as to whether the FWPP "fully aligned" Mr. McClendon's interests with the company's (Compl. ¶¶ 82-85) is a matter of inherently subjective opinion and thus non-actionable under the securities laws.[34] *See, e.g.*, *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, 2005 WL 4161977, at *11 (D. Colo. Oct. 20, 2005) ("descriptions [that] are subjective evaluations [] are not material and cannot form the basis of a securities fraud complaint"); *Sun Healthcare*, 181 F. Supp. 2d at 1291 (finding statements inactionable because "[i]t would be impossible to objectively verify such soft statements that merely convey the subjective assertions of the speaker"); *Lane v. Page*, 581 F. Supp. 2d 1094, 1126-27 (D.N.M. 2008) (noting that "[o]nly when an opinion is both objectively and subjectively false is it actionable" under the securities laws, and dismissing complaint because plaintiff did not make "any allegation of subjective falsity," *i.e.*, that defendants "did not in fact believe that the merger was fair and in shareholders' best interests").

---

mismanagement and, thus, do not support a federal cause of action." *Id.* As the court explained:

> Plaintiff does not aver that management did not actually evaluate the Company's internal controls and determine them to be effective. Instead, implicit in Plaintiff's averments is that had management evaluated the Company's disclosure and financial reporting controls correctly, it would have or should have found them to be deficient.... At base, this allegation is of mismanagement, which is not actionable under federal law. Further, any omission by Red Robin in disclosing its internal mismanagement is not actionable, because Plaintiff may not bootstrap his internal mismanagement claim into a federal securities action....

*Id.* at 683-84 (internal citations omitted).

[34] Indeed, Chesapeake "was under no duty to cast [FWPP alignment] in a pejorative, rather than a positive, light," *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003), and disclosures "do not mislead a shareholder because they fail to state an interpretation . . . the defendants do not share." *Unicorn Fin.-Corp. v. First Union Real Estate & Mortg. Invs.*, 515 F. Supp. 249, 261 (S.D. Ohio 1981).

The same is true for statements about Chesapeake's debt reduction plan, all but

two[35] of which are plainly optimistic or aspirational. *See, e.g.*, Compl. ¶ 122 ("our plan is

to increase liquidity"), ¶ 123 ("we will deleverage"), ¶ 124 ("we intend to…reduc[e] our

debt"), 129 (the plan is "well on its way"), ¶ 130 ("we will deliver on this plan").

Generalized statements regarding Chesapeake's internal controls and code of ethics are

likewise inactionable.[36] *See, e.g., S.E.C. v. Kovzan*, 807 F. Supp. 2d 1024, 1041-42 (D.

Kan. 2011) ("referring to a code of ethics does not imply an absence of violations"

because "otherwise every breach of a fiduciary duty would be transformed into fraud");

*In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 631 (D. Md. 2010)

("Constellation's general statements about its 'strong risk management culture' and

'effective system of internal controls' are mere puffery").[37]

So are the Complaint's allegations regarding Chesapeake's SOX certifications.

Compl. ¶ 160. "SOX certifications themselves are not [independently] actionable" as

misstatements under Section 10(b), *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 620

---

[35] The other two make then-present statements of fact that the Complaint does not aver to be false, with particularized facts or otherwise. *See* Compl. ¶¶ 126, 127.

[36] Indeed, claims based on alleged violations of a code of ethics "ha[ve] been soundly rejected" by courts, *City of Roseville Emp. Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (Del. 2009), because a company's adoption and disclosure of a code -- which is effectively mandated by SEC rules -- "does not imply that all of its directors and officers are in compliance with that code," *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 859 (N.D. Ill. 2009); *see, e.g., Andropolis*, 505 F. Supp. 2d at 685-86 (a code of ethics "is inherently aspirational; it simply cannot be that every time a violation of that code occurs a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory").

[37] *See, e.g., In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 161 (D. Mass. 2009) ("Plaintiffs' internal controls allegations amount to 'generalizations regarding integrity, fiscal discipline and risk management' which are not actionable."); *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (defendant's "statement that it 'set the standard for best practices in risk management techniques'…is so general that a reasonable investor would not depend on it"); *In re Australia Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) ("general statements about [] risk management practices and controls" such as "[m]anagement is committed to achieving…[or] maintain[ing] strong control and financial governance frameworks" constitute inactionable "puffery").

(E.D. Pa. 2009),[38] and, in any event, "[b]oilerplate language in a corporation's 10-K form, or required certifications under Sarbanes-Oxley…add nothing substantial to the scienter calculus…and do not make [Plaintiffs'] otherwise insufficient allegations more compelling by their presence in the same complaint," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003-04 (9th Cir. 2009); *see, e.g.*, *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 544-45 (5th Cir. 2008); *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1145 n.4 (D. Colo. 2011).[39]

## CONCLUSION

The Complaint would not have come close to stating a claim even before Congress in 1995 heightened the standards for pleading securities fraud. Based on the showing set forth above, it should be dismissed with prejudice.

---

[38] *See, e.g.*, *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535, at *17 (N.D. Cal. Mar. 19, 2007); *Backe v. Novatel Wireless ,Inc.*, 642 F. Supp. 2d 1169, 1182 (S.D. Cal. 2009); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1091 & n.6 (C.D. Cal. 2008); *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 732 n.8 (W.D. Ky. 2004); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1020 (S.D. Ohio 2008).

[39] Section 20(a) provides secondary liability for persons who "control" others found to be primarily liable under the Exchange Act. *Fleming II*, 2000 U.S. Dist. LEXIS, at *31. Since Plaintiffs fail to allege primary liability, their secondary liability claim also fails. *Id.*

Dated:  December 6, 2012

**Orrick, Herrington & Sutcliffe LLP**
Robert P. Varian (Admitted Pro Hac Vice)
Kenneth P. Herzinger (Admitted Pro Hac Vice)
M. Todd Scott (Admitted Pro Hac Vice)
Alexander K. Talarides (Admitted Pro Hac Vice)


By:      */s/ Robert P. Varian*
         ROBERT P. VARIAN

The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile:  (415) 773-5759
rvarian@orrick.com
kherzinger@orrick.com
tscott@orrick.com
atalarides@orrick.com

Spencer F. Smith, OBA #20430
McAfee & Taft A Professional Corporation
211 North Robinson, Suite 1000
Two Leadership Square, 10th Floor
Oklahoma City, OK  73102
Telephone.:  (405) 552-2246
Facsimile:    (405) 235-0439
spencer.smith@mcafeetaft.com

*Attorneys for Defendants Chesapeake Energy Corporation, Aubrey K. McClendon, Domenic J. Dell'Osso, Jr., Marcus C. Rowland, Michael A. Johnson, Jeffrey L. Mobley, and Henry Hood*