## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DVORA WEINSTEIN and STEVEN S. WEINSTEIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Case No.: CIV-12-465-W |
| | ) | Chief Judge Vicki Miles-LaGrange |
| Plaintiffs, | ) | |
| vs. | ) ) | |
| AUBREY K. MCCLENDON, DOMENIC J. DELL'OSSO, JR., MARCUS ROWLAND, MICHAEL A. JOHNSON, JEFFREY L. MOBLEY, HENRY HOOD and CHESAPEAKE ENERGY CORPORATION, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## LEAD PLAINTIFF'S RESPONSE AND INCORPORATED BRIEF
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**LABATON SUCHAROW LLP**
Joseph A. Fonti (*pro hac vice*)
Javier Bleichmar (*pro hac vice*)
Dominic J. Auld (*pro hac vice*)
Cynthia Hanawalt (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**RICHARDSON, RICHARDSON, BOUDREAUX, KEESLING, PLLC**
David Keesling, OBA #17881
Heidi Shadid, OBA #22897
7447 South Lewis Avenue
Tulsa, Oklahoma 74136
Telephone: (918) 492-7674
Facsimile: (918) 493-1925

*Lead Counsel for Lead Plaintiff*
*Ontario Teachers' Pension Plan Board*
*and the Class*

*Local Counsel for Lead Plaintiff*
*Ontario Teachers' Pension Plan Board*
*and the Class*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

I.  PRELIMINARY STATEMENT ........................................................ 1

II. FACTUAL BACKGROUND ............................................................. 3

    A.  The VPPs Created Undisclosed Financial Obligations ................................ 3

        1.  The VPPs Were A Key Component Of The Debt-Reduction Plan ............................................................ 3

        2.  Chesapeake Had A Duty To Disclose The VPP Debt Obligations ......................................................... 4

    B.  The FWPP And McClendon's $1.55 Billion Loans ................................... 5

        1.  Defendants Concealed The FWPP Loans And Concomitant Conflicts Of Interest ................................... 5

        2.  The SEC And GAAP Required Disclosure Of The FWPP Loans ................................................................ 7

III. ARGUMENT ........................................................................ 9

    A.  Legal Standards On A Motion To Dismiss Federal Securities Claims ..................................................... 9

    B.  Defendants Made Materially False and Misleading Statements ................................................... 10

        1.  Materially False And Misleading Statements About The FWPP .............................................. 11

        2.  Materially False and Misleading Statements About The VPPs ............................................... 14

        3.  Plaintiffs Do Not Allege Corporate Mismanagement, Nor Are The Allegations Based On Statements Of Opinion Or Optimism ........................................ 18

        4.  Materially False And Misleading Internal Controls Statements ....................................... 20

C.    The Complaint Raises A Strong Inference Of Scienter ............................. 20

     1.    Scienter Pleading Standards ............................................. 20

     2.    Plaintiff Adequately Pled Scienter As To The FWPP Statements ....................................................................... 21

         (a)    Scienter Against Chesapeake And McClendon Is Strong ................................................................ 21

         (b)    Scienter Against The Remaining Defendants Is Strong ................................................................ 23

     3.    Plaintiff Has Adequately Pled Scienter Concerning Defendants' Statements About The VPPs And Debt Reduction Strategy ......................................................... 25

     4.    Defendants' Counter-Arguments Are Unavailing .......................... 26

D.    The Complaint Is Not A "Puzzle Pleading" ................................................. 30

IV.    CONCLUSION ...................................................................... 31

## TABLE OF AUTHORITIES

Page(s)

Cases

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003) ...................................................................... 10, 22, 23

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ..................................................................................... 28

*In re Alstom S.A.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ..................................................................... 17

*In re ArthroCare Corp. Sec. Litig.*,
    726 F. Supp. 2d 696 (W.D. Tex. 2010) .................................................................. 29

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ............................................................................................ 10

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) ..................................................................... 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 10, 11

*Better v. YRC Worldwide Inc.*,
    2012 WL 4433500 (D. Kan. Sept. 25, 2012) ......................................................... 24

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008) ..................................................................... 10

*In re Cardinal Health Inc. Sec. Litig.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ................................................................... 29

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
    2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ............................................................ 30

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) .................................................................................. 19

*City of Philadelphia v. Fleming Co.*,
    264 F.3d 1245 (10th Cir. 2001) ................................................................... 26, 29, 30

*City of Pontiac v. Lockheed Martin Corp.*,
2012 WL 2866425 (S.D.N.Y. July 13, 2012) ............................................................ 21

*In re Countrywide Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................... 17

*Dean v. China Agritech, Inc.*,
2011 WL 5148598 (C.D. Cal. Oct. 27, 2011) .......................................................... 12

*Druskin v. Answerthink, Inc.*,
299 F. Supp. 2d 1307 (S.D. Fla. 2004) .................................................................... 29

*In re Dynegy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) ............................................................... 15, 28

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ..................................................................... 15

*Fogarazzo v. Lehman Bros., Inc.*,
341 F. Supp. 2d 274 (S.D.N.Y. 2004) ...................................................................... 22

*Garcia v. Cordova*,
930 F.2d 826 (10th Cir. 1991) ................................................................................. 11

*Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust*,
825 F. Supp. 2d 1082 (D.N.M. 2011) ...................................................................... 19

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
2011 WL 1336473 (D.N.M. Mar. 31, 2011) ............................................................ 18

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) ......................................................... 17, 22, 25

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010) .................................................................... 29

*Kogan v. Robinson*,
432 F. Supp. 2d 1075 (S.D. Cal. 2006) .................................................................... 20

*Kunz v. S.E.C.*,
2003 WL 1605865 (10th Cir. March 28, 2003) ............................................. 11, 16, 19

*Litwin v. Blackstone Group L.P.*,
634 F.3d 706 (2d Cir. 2011) ..................................................................................... 12

*Middlesex Ret. Sys. v. Quest Software Inc.,*
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...................................................... 28

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West*,
  320 F.3d 920 (9th Cir. 2003) ...................................................... 27

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000)...................................................... 23, 25

*Pirraglia v. Novell,*
  339 F.3d 1182 (10th Cir. 2003) ...................................................... passim

*Podany v. Robertson Stephens, Inc.*,
  318 F. Supp. 2d 146 (S.D.N.Y. 2004)...................................................... 22

*S.E.C. v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963)...................................................... 10

*In re Salomon Analyst AT&T Litig.*,
  350 F. Supp. 2d 455 (S.D.N.Y. Dec. 2, 2004) ...................................................... 22

*In re Scottish Re Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)...................................................... 20

*In re SemGroup Energy Partners Sec. Litig.*,
  729 F. Supp. 2d 1276 (N.D. Okla. 2010)...................................................... passim

*Snellink v. Gulf Res., Inc.*,
  870 F. Supp. 2d 930 (C.D. Cal. 2012) ...................................................... 14

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...................................................... 21, 22, 23

*In re Telxon Corp. Sec. Litig.*,
  133 F. Supp. 2d 1010 (N.D. Ohio 2000)...................................................... 19

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ...................................................... 11

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)...................................................... 10

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................... 31

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1206 (N.D. Okla. 2003) ("*Williams I*") ..................................... passim

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1242 (N.D. Ok. 2003) ("*Williams II*") ................................... 22, 23, 31

*Windon v. FDIC*,
    805 F.2d 342 (10th Cir. 1986) ..................................................................................... 11

*Zagami v. Natural Health Trends Corp.*,
    540 F. Supp. 2d 705 (N.D. Tex. 2008) .................................................................. 12, 14

## STATUTES

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ............ 9, 11, 31

## OTHER AUTHORITIES

17 C.F.R. 229.303(a)(1) ..................................................................................................... 5

17 C.F.R. 240.10b-5 ....................................................................................................... 10

I.      **PRELIMINARY STATEMENT**

This securities class action arises from a series of false statements and omissions which materially misled the public about Chesapeake's real financial condition. Investors and Wall Street analysts were closely tracking Chesapeake's finances during the Class Period because the Company was substantially over-leveraged, and had tight cash flow and massive capital expenditures.  Unbeknownst to the public, however, Defendants concealed two types of financial obligations incurred by Chesapeake and McClendon totaling nearly $3 billion.[1]

Defendants first concealed key obligations from a type of transaction called a Volumetric Production Payment ("VPP").  A VPP generates immediate cash in exchange for the delivery of gas over time.  Chesapeake disclosed that it executed six VPPs during the Class Period and that it raised $3.6 billion, but concealed that the VPPs obligated Chesapeake to incur significant future production costs totaling **$1.4 billion**.

Separately, Defendants also did not disclose that McClendon had accumulated more than **$1.5 billion** in personal debt, collateralized by the future production of Chesapeake's gas wells.  Chesapeake had allowed McClendon to buy a 2.5% interest in many of its gas wells through the Founder Well Participation Program ("FWPP").  Defendants repeatedly claimed that the FWPP "fully align[ed] the interests of Mr. McClendon with the Company."  But McClendon secretly financed his stakes with loans from lenders who also did business with Chesapeake.  This created substantial conflicts

---

[1] All undefined capitalized terms are defined in the Complaint (Dkt. 71).  All emphasis is supplied unless otherwise stated.  "Def. __" refers to citations to Defendants' brief.

of interests.  McClendon was actually competing in the capital markets against his own Company.  There was also the obvious possibility of *quid pro quo* arrangements.  When the FWPP and VPP financial obligations were disclosed, the market's response was immediate and scathing.  The Company's share price dropped nearly 20% as investors re-assessed Chesapeake's true value.

In response to Plaintiff's allegations, Defendants resort to overblown rhetoric to mask the lack of substance of their arguments.  Defendants only contest falsity and scienter.  Contesting falsity, Defendants raise multiple factual disputes that are not only improper on a motion to dismiss, but also factually wrong.  For example, they argue that the Company disclosed the VPPs' costs because these were subsumed within its reported overall costs.  But this contradicts the Company's prior public admission that it had not disclosed the costs.  And even if the VPPs' costs were somehow disclosed (which is not the case), Plaintiff alleges in detail the accounting and SEC rules that required disclosure of the future VPP costs, separately.  Had the VPPs' financial obligations really been disclosed, as Defendants insist, the market would not have sold off on the news.

With respect to scienter, Defendants' arguments are equally infirm.  Their contention that Defendants "purchased" stock, negating scienter, misstates the case law and overstates the economic reality.  Except in minimal amounts, Defendants did not purchase Chesapeake stock with their own cash.  They received free stock awards and options, and actually sold millions of dollars of stock to fund the exercise of those options.  McClendon sold $18 million worth of stock.  Defendant Hood even sold call options, betting **against** the Company and profiting when the stock price did not go up.

2

Defendants' other arguments are similarly misguided.  For example, McClendon's scienter with respect to the FWPP loans is based on his personal knowledge, not as Defendants' straw man suggests, on his role as CEO.  As with every aspect of this case, Defendants' righteous indignation cannot obscure the strength of Plaintiff's allegations.

## II.   FACTUAL BACKGROUND

### A.   The VPPs Created Undisclosed Financial Obligations

#### 1.  The VPPs Were A Key Component Of The Debt-Reduction Plan

At the outset of the Class Period, Chesapeake's credit rating was "junk" and gas prices were reaching record lows.  (¶¶58-59).  Chesapeake thus announced that it would reduce borrowings while increasing liquidity and asset monetizations.  (¶60).  The Company's goal was to decrease debt and increase production by 25% each – dubbed the 25/25 Plan.  (¶64).  As part of this strategy, Chesapeake raised cash through VPPs.  (¶68).  Chesapeake disclosed many details about the VPPs, highlighting the gross proceeds that immediately increased Chesapeake's cash flow and reduced debt.  (¶68).

Chesapeake, however, did not disclose a critical aspect of the VPPs: the future costs Chesapeake was obligated to pay.  (¶¶77, 106-08).  These costs were fixed and mandatory; Chesapeake could not choose to suspend production and avoid those costs.  Once Chesapeake executed the VPPs, the costs associated with the future production became **future contractual financial obligations** that were no different than a loan – Chesapeake received cash upfront and incurred an obligation.  (¶¶65, 106).

On May 10, 2012, an investigation by *The Wall Street Journal* concluded that the future financial obligations arising from the VPPs were $1.4 billion – "far larger than

previously believed by investors and analysts." (¶106). While Chesapeake had disclosed the revenues, *The Journal* pointedly noted that "it [had] not provided details about the costs to fulfill them, such as pumping and delivering the oil and gas." *Id.*

This undisclosed debt was material and substantial, representing over 10% of Chesapeake's outstanding debt of about $13 billion. (¶59). Together with McClendon's billion-dollar personal loans, **Chesapeake's wells now had to support a debt load that had ballooned by almost $3 billion** and was well over 20% of the amount previously disclosed. For a Company whose economic future self-admittedly hinged on liquidity, debt overhang, and restricted cash flows, this one-two punch was severe. (¶¶58, 60, 122). As a result, the stock price violently adjusted to reflect Chesapeake's true value, falling about 20% from $18.06 on April 19, 2012, to $14.81 on May 11, 2012. (¶¶78, 113).

### 2.  Chesapeake Had A Duty To Disclose The VPP Debt Obligations

The failure to disclose the VPP-related liabilities violated Chesapeake's disclosure obligations. Gas reserves are typically reflected as assets on the balance sheet because they can be sold in the future and their value monetized. (¶106; *see* Def. Ex. 20 at 133). By executing a VPP, however, the Company monetized the value of the reserves, forcing Chesapeake to take the reserves off the balance sheet. Because VPPs are therefore off-balance sheet transactions, they are subject to disclosure under the Sarbanes-Oxley Act of 2002 ("SOX"). (¶72). Congress specifically enacted SOX in the aftermath of Enron to prevent companies from hiding off-balance sheet debt. (¶73). Off-balance sheet arrangements are defined under SOX §401(a) to include, like here, "agreement[s] or other contractual arrangement[s] with an unconsolidated entity, under which the company has

an obligation under certain guarantee contract[s]." (¶74).  SOX then explicitly required

Chesapeake to report the **expenses**, like production costs.  (¶74).

SEC Regulation S-K includes similar disclosure requirements.  Item 303(a)

obligates Chesapeake to disclose "commitments . . . that will result in or that are

reasonably likely to result in the registrant's liquidity increasing or decreasing in any

material way." (¶75; *see also* 17 C.F.R. 229.303(a)(1)).  Item 303(a) specifically targets

off-balance sheet transactions and explicitly calls for disclosure of expenses:

> (i) **In a separately-captioned section**, discuss the registrant's **off-balance sheet arrangements that have or are reasonably likely to have a current or future effect** on the registrant's financial condition, changes in financial condition, revenues or **expenses**, results of operations, liquidity, capital expenditures or capital resources that is material to investors.  (¶ 75).

Chesapeake was specifically on notice of this obligation to disclose the VPP-

related costs based on a letter from the SEC. (¶76).  Chesapeake also acknowledged this

disclosure obligation, given that it reported the revenues arising from the VPPs as

required by Regulation S-K, but misleadingly concealed the costs.[2]

## B.     The FWPP And McClendon's $1.55 Billion Loans

### 1.  Defendants Concealed The FWPP Loans And Concomitant Conflicts Of Interest

Also central to this case is McClendon's unique compensation scheme – the

FWPP.  Unbeknownst to investors, McClendon borrowed over $1 billion in order to

[2] Chesapeake's concealment of the financial obligations arising from the VPPs explains their unpopularity – as McClendon admitted, "the whole [VPP] market is ours."  (¶67).  Unable to use the VPPs to hide debt, as Chesapeake fraudulently did, the rest of the market did not find VPPs economically attractive or justifiable.

participate in the FWPP and used his interests in the wells as collateral.  (¶78).

Defendants concealed McClendon's indebtedness because it materially changed his

relationship with Chesapeake and created direct and undisclosed conflicts of interests.

     First, McClendon stood to gain outsized profits by having Chesapeake acquire as

much land as possible, regardless of the cost to the Company.  McClendon had a

disproportionate interest in speculating because he only paid for the land that "spudded"

wells.  (¶¶81-82).  While the FWPP required McClendon to pay a proportional share of

land acquisition costs for the wells he invested in, the FWPP specifically provided that

McClendon would only invest in wells that were "drilled."  (¶¶41, 82).  Thus, the cost of

land the Company later determined to be unproductive was borne solely by Chesapeake.

     *Forbes* magazine described the conflict as follows:  "McClendon only participates

in the good acreage; he doesn't get docked for the bad acreage Chesapeake has no use

for.  Thus, he is absolutely guaranteed to get better opportunities and better returns than

Chesapeake's shareholders."  (¶82).  *Forbes* thus concluded, "[t]he simple truth is that

McClendon's well participation perk **does not** align his interest with those of

shareholders."  (Def. Ex. 31 at 5).  Morningstar similarly determined that "McClendon's

borrowing to fund his share of well costs **effectively short-circuits the alignment of**

**interest** that should result from his participation alongside Chesapeake."  (¶85).  This

explains why, when gas prices were at an all-time low, McClendon drove Chesapeake to

acquire massive tracts of land, spending over $31 billion over the last 15 years.  (¶¶1, 81).

     Second, McClendon compounded this conflict by obtaining his loans mostly from

Chesapeake's own lenders, particularly EIG Global Energy Partners ("EIG").  EIG

financed at least $2.5 billion of Chesapeake's debt while it lent $1.33 billion to

McClendon.[3]  (¶¶86-88).  McClendon was thus competing with Chesapeake for financing

at a time the Company desperately needed cash.  (¶92).  Another conflict included the

obvious *quid pro quo* – better personal terms for McClendon in exchange for continuous

corporate business, or worse, inferior terms for Chesapeake.  The terms of the EIG loans

further exacerbated the conflict by mandating McClendon's allegiance to his lenders, and

by incentivizing him to ensure the Company kept acquiring land.  (¶¶7, 81, 87).[4]

    While concealing McClendon's FWPP loans and the glaring conflicts of interest

they engendered, Defendants falsely publicized the opposite: that the FWPP **aligned**

McClendon's interests with those of the Company.  (¶4).  Defendants missed no

opportunity to reiterate the supposed alignment of interests.  (¶¶43-45, 136-39).  But all

these statements were revealed to be false when McClendon's FWPP loans and attendant

conflicts of interests were disclosed.  The press reacted harshly (*e.g.*, "the clear and

undeniable implication [is that] McClendon is up to his **eyeballs** in conflicts") (¶8), as did

the market, which punished Chesapeake's stock with an immediate 10% drop.  (¶78).

### 2.  The SEC And GAAP Required Disclosure Of The FWPP Loans

<u>Disclosure Of Related Party Transactions</u>. The SEC and GAAP required

---

[3] The Complaint has a typographical error: "1.33 million" should be "1.33 billion." (¶87).

[4] In addition to EIG, *The Journal* reported that "several major Wall Street banks have lent [McClendon] money and then received lucrative work as public-offering underwriters or financial advisers to Chesapeake." (¶89).  For example, Wells Fargo extended a personal loan to McClendon in 2010, while having served as a financial advisor to Chesapeake on ten transactions since 2005 valued at nearly $9.9 billion.  (¶90).

Chesapeake to disclose McClendon's FWPP loans.  (¶47).  GAAP provision ASC 850, entitled Related Party Disclosures, mandates that "[i]nformation about transactions with related parties that would **make a difference in decision making** shall be disclosed so that users of the financial statements can evaluate their significance." (¶49).  Similarly, SEC Regulation S-K requires disclosure of "**[a]ny other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction**." (¶52).

The FWPP was undeniably a related party transaction between McClendon and Chesapeake.  Chesapeake's financial statements disclosed it as such.  (¶53).  Nonetheless, Chesapeake concealed the critical fact that, as part of the FWPP transaction, McClendon borrowed over $1 billion, pledging his 2.5% stake of Chesapeake's wells as collateral for the loans, and that his lenders had also loaned Chesapeake over $2.5 billion.  (¶¶ 46, 88).

This falls squarely within the disclosure required under Regulation S-K of "any other information . . . that is material to investors." (¶52).  Further, the massive size of the loans (certainly for personal loans), and the FWPP incentive for McClendon to drive Chesapeake to acquire land without regard to cost, also mandated disclosure because that information (McClendon's loans) would "make a difference in decision making." (¶54).

<u>Disclosure Of Executive Compensation</u>. McClendon's FWPP loans were also required to be included in the executive compensation disclosures.  Regulation S-K obligates Chesapeake to "explain **all material elements** of the registrant's compensation of the named executive officer," including the "objectives" and "how each compensation element . . . fit[s] into [the] overall compensation objectives." (¶57; Item 402(b)(1)).  The

$1.55 billion in loans was material to the public's understanding of McClendon's compensation and his FWPP interest, as evidenced by the market's reaction upon their disclosure.  (¶¶79-85, 88).  The loans converted McClendon's interest into a free option, not a personal equity investment, because McClendon had not invested any of his own cash.  (¶¶46, 78).  Instead, McClendon paid for his FWPP interest with $1.55 billion in loans that were only secured by interests in the wells.  *Id.*  If the wells were profitable, McClendon would repay the loan and make a tidy profit.  If not, McClendon would turn over the worthless wells to the lenders and not suffer a loss.

The difference between real equity (or "skin in the game," as Chesapeake claimed McClendon had) and a free option is so material that Regulation S-K requires that both be disclosed separately.  (¶¶5, 57).  Accordingly, Chesapeake distinguished between Defendants' equity holdings and option awards in every Proxy it filed during the Class Period.  As all public companies implicitly acknowledge in these disclosures, there is a material difference between an incentive where one's own money is at risk, and one where the risk is merely upside – indeed, the latter, like the FWPP, is a lottery ticket.[5]

## III.   ARGUMENT

### A.   Legal Standards On A Motion To Dismiss Federal Securities Claims

Under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and

---

[5] Defendants claim that the FWPP interests are not "executive compensation" because McClendon paid for them.  (Def. 18).  This defies any common sense understanding of executive compensation, and contradicts the Company's public classification of the FWPP as executive compensation.  *See, e.g.*, Ex. 1 at 57; Ex. 2 at 40.  ("Ex. _" refers to exhibits attached to the Declaration Of Cynthia A. Hanawalt).  Indeed, the FWPP is even administered by the Compensation Committee.  *See, e.g.*, Def. Ex. 16 at 46-47.

Rule 10b-5, 17 C.F.R. 240.10b-5, Plaintiff must plead: (1) a materially false or misleading statement; (2) a connection between the statement and purchase or sale of a security; (3) scienter; (4) reliance; and (5) damages. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). In analyzing these elements *Iqbal* requires that the "court . . . assume the[] veracity" of the allegations and accept them as true. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940-41 (2009). Nothing in the PSLRA changes this maxim, and Defendants are not entitled to challenge the facts alleged – as they improperly do.

### B.     Defendants Made Materially False and Misleading Statements

The Supreme Court has said that the "fundamental purpose" of the securities laws is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *S.E.C. v. Capital,* 375 U.S. 180, 186 (1963). The objective of full disclosure is "to inform, not to challenge the reader's critical wits." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). Consistent with this framework, Plaintiff need only "state a claim to relief that is **plausible** on its face." *Bell Atl.  v. Twombly*, 550 U.S. 544, 570 (2007). The PSLRA merely layers a heightened pleading standard over plausibility, requiring Plaintiff to plead particularity – the who, what, when, where, and why the statements were plausibly false. *In re Bristol Myers Sec. Litig.*, 586 F. Supp. 2d 148, 162 (S.D.N.Y. 2008) ("[T]he Court must merely decide whether Plaintiffs have pleaded their claims with sufficient particularity and whether it is plausible that the use of such terms in [the] public disclosures . . . [misled the] market"). Accordingly, the issue is whether the alleged falsity is plausible, not whether there are competing inferences under which the alleged falsity could be true. *See In re SemGroup Energy*, 729 F. Supp. 2d 1276,

1288 (N.D. Okla. 2010).  Plaintiff has established plausibility so long as the likelihood of

falsity rises "above the speculative level."  *Twombly*, 550 U.S. at 555.

### 1.  Materially False And Misleading Statements About The FWPP

Although Defendants strain to suggest otherwise, Plaintiff's fraud claim pertaining

to the FWPP is simple: Defendants failed to disclose over a billion dollars in personal

loans to McClendon from Chesapeake's lenders to fund his FWPP interests.  (¶¶78-79).

Defendants **concede** that the magnitude of the loans was not disclosed.  (Def. 4).

"Under Section 10(b), a failure to disclose is actionable where a defendant is under

a duty to disclose the information."  *SemGroup*, 729 F. Supp. 2d at 1292 (citing *Windon v.

FDIC*, 805 F.2d 342, 347 (10th Cir. 1986)).  Defendants had "an affirmative duty to

disclose material facts which [were] known to them . . . but which [were] not known to

persons with whom they deal and which, if known, would affect their investment

judgment."  *Id.* (quoting *Garcia v. Cordova*, 930 F.2d 826, 828-29 (10th Cir. 1991)).

Materiality turns on whether "a reasonable investor would consider [a fact] important in

determining whether to buy or sell."  *Id.* at 1287-88.  This "determination requires

delicate assessments of the inferences a reasonable shareholder would draw . . . and **these

assessments are peculiarly ones for the trier of fact**."  *TSC Indus., Inc. v. Northway,

Inc.*, 426 U.S. 438, 449 (1976).

Based on this standard, there is no question that McClendon's billion-dollar

personal FWPP loans were material.  As discussed above, the loans created clear

conflicts of interest.  Even the possibility of a conflict of interest is material.  *Kunz v.

S.E.C.*, 2003 WL 1605865, at *5 (10th Cir. March 28, 2003) ("The fact that [defendant]

11

**might** be operating under a conflict of interest . . . would no doubt be important to any [investors] in their decision to purchase"); *see also Zagami v. Natural Health* 540 F. Supp. 2d 705, 713 (N.D. Tex. 2008) (disclosure required of CEO's share in vendor's commissions because CEO thus had an interest in company's use of vendor).

Defendants also had a distinct and separate duty to disclose McClendon's FWPP loans under GAAP and Regulation S-K.  (¶¶46-57).  *Litwin v. Blackstone Group L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (finding duty to disclose pursuant to Regulation S-K); *Dean v. China Agritech,* 2011 WL 5148598, at \*4 (C.D. Cal. Oct. 27, 2011) (finding that a related party transaction should have been disclosed under GAAP and SEC regulations).  Plaintiff's GAAP and SEC allegations are extremely detailed and particularized, including the exact provisions and explaining precisely how concealing the FWPP loan violated those provisions.  (¶¶46-57).  Plaintiff's claims thus rise beyond the speculative level and plausibly allege falsity with particularity.  *Pirraglia v. Novell*, 339 F.3d 1182, 1190 (10th Cir. 2003) (sustaining falsity of GAAP allegations).

The Court must accept these allegations as true; Defendants cannot contest the application of GAAP and SEC regulations once Plaintiff has pled the plausibility of those violations.  *Pirraglia*, 339 F.3d at 1193.  The Tenth Circuit held as much when it rejected defendants' argument that plaintiffs' allegations of accounting irregularities were incorrect because neither the SEC nor the auditors had taken action: "[a]t this stage, it is not our role to evaluate the accuracy of plaintiffs' well-pleaded facts; the only questions are whether the plaintiffs satisfy the Reform Act pleading requirements." *Id*. at 1194.

Defendants ignore this binding precedent and argue that the Court should rule as a

matter of law that Defendants had no obligation to disclose the FWPP loans.  (Def. 18).

Defendants thus improperly dispute the truth of the allegations and argue that the FWPP

loans were not third-party related transactions under GAAP and SEC regulations, asking

the Court to interpret GAAP and decide a factual question.  (Def. 18).  This argument can

be rejected simply because it is improper on a motion to dismiss under *Pirraglia*.

More substantively, Defendants are wrong about GAAP and the SEC disclosure

requirements.  Defendants publicly admitted during the Class Period that the FWPP was a

related party transaction.  (¶¶53, 134).  Even Chesapeake's financial statements disclosed

the FWPP in the "Related Party Transactions" section.  *Id*.  As a result, GAAP and SEC

rules required the FWPP loans to be disclosed as part of the concomitant duties that arose

because the FWPP was a related party transaction.[6]

Defendants ignore that the FWPP itself was a related party transaction requiring

disclosure of the loans, narrowly focusing on the fact that the FWPP loans were executed

between McClendon and the lenders to argue that neither are related parties.  (Def. 17-

18).  Defendants miss the point: the FWPP is the related party transaction, not the FWPP

loans.  Defendants further ignore that disclosure does not hinge on formalities, but on the

underlying economic reality.  *See Zagami*, 540 F. Supp. 2d at 711 ("Disclosure is the

---

[6] Under GAAP, ASC 850 requires disclosure of "[i]nformation [*i.e.*, the FWPP loan]
about transactions with related parties [*i.e.*, the FWPP] that would make a difference in
decision making."  (¶49).  Similarly, Regulation S-K requires disclosure of "[a]ny other
information" (*i.e.*, the FWPP loan) "regarding the transaction [*i.e.*, the FWPP] or the
related person [*i.e.*, McClendon]" that is "material to investors."  (¶52).  Here, the FWPP
loan created conflicts of interest (land acquisition and financing interests diverged), and,
thus, materially affected McClendon's decision making and should have been disclosed.

overriding principle governing related-party transactions, . . .[as] they have proven to be an easy and effective way . . . to misstate the economic substance and reality of financial information"); *Snellink v. Gulf Res.,* 870 F. Supp. 2d 930, 934, 941 (C.D. Cal. 2012) ("The omission of **related party transactions** is not a trifle.  Common sense dictates that this is material information and indeed, Regulation S–K devotes an entire section and notes that it **is one of the core disclosures that companies have to report**.").[7]

Finally, Defendants' related argument that McClendon's personal finances need not be disclosed is equally off point.  (Def. 15).  The duty to disclose arises because the FWPP is a related-party transaction, regardless of whether the loan information includes personal finances.  There is no blanket immunity for personal financial data.[8]

### 2.   Materially False and Misleading Statements About The VPPs

There is no dispute that the VPPs obligated Chesapeake to incur production costs in order to fulfill its contractual promise to deliver future well production.  (¶65).  In May 2012, *The Journal* revealed that the amount of contractually-agreed-to production costs from the VPPs totaled $1.4 billion.  (¶106).  Chesapeake had never disclosed that.  (¶¶12, 66-71, 106-08).  The news caused a liquidity crisis and the need for the Company to enter

---

[7] Defendants cite no basis for their additional argument that the disclosure requirements on executive compensation are inapplicable because McClendon's well interests were not cash flow positive.  (Def. 14-15).  This is tantamount to arguing that stock options that are not "in the money" are not compensation, and is not persuasive.  Defendants' other claim that McClendon has not benefitted from the FWPP is also incomprehensible – Chesapeake's SEC filings value McClendon's FWPP interests at $400 million.  (¶41).

[8] Defendants materially misquote their SEC filings, arguing that Chesapeake disclosed McClendon's FWPP interests as "separate and distinct from the Company's interests." (Def. 16-17).  The SEC filings **do not** say that.  (Def. Ex. 18 at 52-53; Ex. 19 at 62).

into an emergency bridge loan of $4 billion at nearly usurious rates – 8.5%.  (¶111).

Chesapeake's massive debt load, Wall Street's concern with the Company's ability to

service debt, Chesapeake's focus on debt reduction, and Defendants' false statements that

the VPPs were central to the debt reduction strategy, all heightened the materiality of this

news.  (¶¶60-71, 122-31).  The truth was that the VPPs increased – not reduced – debt by

a huge, undisclosed amount relative to the Company's total liabilities.

    These allegations easily meet the plausibility and particularity requirements, as

many courts have held when confronted with similar arrangements.  For example, in

*Dynegy*, defendants had "fraudulently understated the Companies' debt" by hiding the

proceeds of an off-balance sheet transaction.  *In re Dynegy Sec. Litig.*, 339 F. Supp. 2d

804, 891 (S.D. Tex. 2004).  The court found that Dynegy's accounting treatment

concealed the "repayment obligation, ratings triggers and other key terms" that would

have revealed defendants' true debt load.  *Id.*  Enron similarly concealed debt by

improperly excluding from its financial reports a related entity's obligations (while

reporting the revenues).  *In re Enron Sec., Litig* 235 F. Supp. 2d 549, 616-17 (S.D. Tex.

2002).  Like Enron, Chesapeake concealed the debt while touting the proceeds of the

VPPs.  *Id*. at 693.  And *Williams* found misleading the failure to disclose guarantees of a

related entity's debt.  *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1236 (N.D. Okla.

2003) ("*Williams I*").  Since the failure to disclose a guarantee is actionable, which is one

step removed from actually incurring the debt, so is Chesapeake's debt.[9]

---

[9] Defendants were also under an affirmative duty to disclose the costs associated with

Given the simplicity and self-evident nature of the falsity in concealing $1.4 billion in debt, Defendants resort to smoke and mirrors.  They first claim that the VPPs are "sale transactions" that "do not constitute debt," and thus do not create any "debt or liability to place **on the balance sheet**."  (Def. 19).  This is, at best, semantics, and not disputed.  Plaintiff agrees.  As alleged, the VPPs constitute sales of Chesapeake's oil and gas, which initially appeared on the balance sheet as assets, but were then removed from the balance sheet simultaneously with the execution of the VPP.  (*See* ¶¶65, 72; Def. concur at 19).  But this is irrelevant.  The critical point, which Defendants admit, is that under the VPPs Chesapeake took on a "future obligation" to incur production costs to deliver oil and gas.  (Def. 19).  This future financial obligation is **not** reflected on the balance sheet, but is still a financial obligation – by definition, an off-balance sheet obligation.  (¶¶74-75).  Accounting rules and SEC regulations do not turn on the use of magic words (debt, liability, etc.), but on the underlying economic reality.  (¶¶72-76).

Defendants then suggest that the VPPs' $1.4 billion financial obligation actually was disclosed.  This is disingenuous.  Chesapeake did not break out the VPPs' future production costs.  (¶106).  Defendants merely point to where Chesapeake reported and provided future guidance of its operating costs for the entire Company, including all of its on-balance sheet owned oil and gas.  (Def. 19 n.28).  For example, Chesapeake provided investors with guidance for 2012 on "well costs on proved properties" of $6.5-$7 billion.

VPPs in light of the significance of the VPP transactions to Chesapeake's financial condition. *Kunz*, 2003 WL 1605865 at *4 ("surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge").

(Def. Ex. 30 at 4-5).  Defendants now argue that embedded in those numbers are the

VPPs production costs for 2012, despite having acknowledged to the press in response to

the *Journal* investigation that the Company **had not disclosed** its VPP debts.  (¶106).

Regardless, even under Defendants' argument, investors had no way of knowing if the

VPP costs for 2012 were $1 or $500 million, nor did the $6.5-$7 billion numbers disclose

the ongoing future obligations of $1.4 billion.  (¶¶106, 118).  Indeed, that is why the

market was surprised by *The Journal's* revelations and the stock sold off.  (¶107).

This aggregate disclosure that Defendants point to also does not meet the

disclosure obligations because, by subsuming the VPP costs within the total production

expenses, the supposed disclosure masked the true VPP debt.  *See In re Countrywide Sec.

Litig.*, 588 F. Supp. 2d 1132, 1160 (C.D. Cal. 2008); *In re Alstom S.A.*, 406 F. Supp. 2d

433, 452, 453 n.11 (S.D.N.Y. 2005) ("An investor should not be called upon to piece

together buried information").[10]

Defendants' argument fails for one last reason.  It is simply not true that the VPPs'

operating costs were included in the projected guidance.  (Def. 19).  The May 1, 2012

"Outlook" that Defendants point to actually **excludes** VPP production costs.  (Def. Ex. 30

at 4-5).  The Outlook shows reduced operating costs, and indicates that those entries

"reflect" "curtailments" and "production decreases" associated with "VPP and other

---

[10] Even if the aggregate disclosure of Chesapeake's total operating costs disclosed the
Company's VPP liabilities, which it did not, Defendants' argument is then predicated on
the "truth-on-the-market" doctrine.  This "is a fact-intensive query that cannot be
disposed of on a motion to dismiss." *Hall v. The Children's Place*, 580 F. Supp. 2d 212,
229 (S.D.N.Y. 2008).  The market's reaction to the disclosure of the VPP liabilities
further shows this is a factual issue.  (¶¶ 106-08).

monetization transactions." *Id.* Thus, the evidence that Defendants present actually

confirms that the VPP costs were not disclosed.

### 3. Plaintiffs Do Not Allege Corporate Mismanagement, Nor Are The Allegations Based On Statements Of Opinion Or Optimism

Defendants argue vaguely that "[m]uch of what Plaintiffs complain about" raises a

claim of "corporate mismanagement," not securities fraud. (Def. 22-23).  But Defendants

are not alleged to be "simply poor managers – they are alleged to be dishonest ones."

*SemGroup*, 729 F. Supp. 2d at 1292.  Even if Defendants' conduct involves

mismanagement, it is also prohibited by the securities laws because Defendants "failed to

disclose a specific material fact resulting from that mismanagement." *Id.*  Defendants did

not disclose the FWPP loan, the conflicts of interest, or the VPPs' financial obligations

even though they had a duty to do so – this was fraud, not mere mismanagement.

Defendants then claim that their statements were inactionable opinions – so-called

puffery.  (Def. 23).  But puffery is limited to statements that are impossible to verify (as

Defendants admit at 23), and Defendants' statements about the alignment of interests and

debt reduction are objectively verifiable and objectively false.  *Guidance Endodontics v.*

*Dentsply*, 2011 WL 1336473, at *7-8 (D.N.M. Mar. 31, 2011) ("The term puffery is used

to characterize those vague generalities that no reasonable person would rely on as

assertions of particular facts").  Indeed, the statements about debt reduction and VPPs

failed to disclose an objective fact: that the VPPs also increased debt by $1.4 billion.  It is

absurd to suggest that a specific dollar amount of debt, like $1.4 billion, is not objectively

verifiable.  *City of Monroe v. Bridgestone*, 399 F.3d 651, 674 (6th Cir. 2005) (statements

supported by specific facts are not puffery).  Similarly, the FWPP loans objectively did

not align the interests of McClendon with Chesapeake – instead they created clear

conflicts of interest that violated SEC and GAAP regulations.  (¶¶46-56).  Defendants

may argue at trial that there was no conflict of interest – but that is a determinable fact for

the jury.  *See Kunz*, 2003 WL 1605865 at *4 (failure to disclose conflict of interest was

material and violated the securities laws).[11]

Finally, Defendants briefly challenge the falsity of the statements concerning

Chesapeake's debt-reduction strategy and 25/25 Plan, (¶¶58-64), asserting, without case

support, that the statements are "plainly optimistic."  (Def. 24).  But courts have long

held that statements regarding the effective implementation of a core business strategy

are actionable.  *See, e.g.*, *In re Atlas Air Sec. Litig.*, 324 F. Supp. 2d 474, 482 (S.D.N.Y.

2004) (statement that "cost efficiency and debt reduction programs continued to bear

fruit" found actionable); *Williams I*, 339 F. Supp. 2d at 1224-29 (same re: "natural

evolution of a business strategy begun in 1998" and "sound funding strategy"); *In re

Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1016 (N.D. Ohio 2000) (same re:

"successful implementation of [] cost-cutting initiatives should allow [defendant

company] to return to profitability").

---

[11] Even if the alleged false statements were opinions, which they are not, such statements
are actionable where, as here, Defendants did not genuinely or reasonably believe the so-
called opinions.  *See, e.g., Genesee v. Thornburg*, 825 F. Supp. 2d 1082, 1178 (D.N.M.
2011).  McClendon's loans raised such obvious and acute conflicts of interest that
Defendants could not have reasonably believed that the interests were aligned.  (¶43).

### 4. Materially False And Misleading Internal Controls Statements

After Enron, Congress required public companies to certify the effectiveness of internal controls over financial reporting under SOX. *Kogan v. Robinson*, 432 F. Supp. 2d 1075, 1077 (S.D. Cal. 2006). Thus, in every quarterly report during the Class Period, Chesapeake stated that McClendon and the Company's CFO had reviewed and endorsed the Company's disclosure process and found that the "disclosure controls and procedures are effective." (¶160). These statements were false and misleading, as Chesapeake's internal controls were ineffective and failed to prevent the exact same type of false statements that led to Enron's demise. Accordingly, these statements are actionable in light of the failure of Chesapeake's internal controls. *See SemGroup*, 729 F. Supp. 2d at 1289 (failure to disclose ineffective internal controls actionable); *In re Scottish Re Sec. Litig.*, 524 F. Supp. 2d 370, 390-91 (S.D.N.Y. 2007) (SOX certifications are actionable).

### C. The Complaint Raises A Strong Inference Of Scienter

#### 1. Scienter Pleading Standards

Scienter is a mental state "embracing intent to deceive, manipulate, or defraud." *Pirraglia*, 339 F.3d at 1190. It encompasses deliberate misconduct and recklessness. Recklessness constitutes "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that he must have been aware of it." *Williams I*, 339 F. Supp. 2d at 1218. Plaintiff may plead recklessness if "defendants published statements when they knew facts or **had access to information suggesting** their public statements were materially inaccurate." *SemGroup*, 729 F. Supp. 2d at 1297.

The PLSRA requires pleading a "strong" inference of scienter. *Tellabs v. Makor*, 551 U.S. 308, 324 (2007). Scienter is "strong" if it is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. Thus, "a tie on scienter goes to the plaintiff." *City of Pontiac v. Lockheed*, 2012 WL 2866425 at *12 (S.D.N.Y. July 13, 2012). Critically, a court must determine "whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 at 322-23.

### 2.  Plaintiff Adequately Pled Scienter As To The FWPP Statements
#### (a) Scienter Against Chesapeake And McClendon Is Strong

As an initial matter, McClendon had actual knowledge of his FWPP loans: he personally executed them. (¶87). This is not in dispute, and is more than sufficient to establish McClendon's scienter. *SemGroup*, 729 F. Supp. 2d at 1297. ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they **knew** facts . . . suggesting their public statements were materially inaccurate"). Defendants, however, have the temerity to argue that Plaintiff avers scienter only based on McClendon's senior position. (Def. 7-9). This is nonsense. McClendon knew of the loans because he signed them, not because of his position. This, alone, raises a strong inference of scienter; the competing inference is not even plausible.

McClendon also had motive to conceal his FWPP loans and the conflict they created with Chesapeake. Allegations of motive are probative of scienter. *Williams I*, 339 F. Supp. 2d  at 1234 (finding scienter where "Defendants had a strong motive to misrepresent [the] financial statements"); *SemGroup* 729 F. Supp. 2d at 1297. The loans

materially changed the character of the FWPP from a program advertised to investors as aligning McClendon's interests with Chesapeake's, to one in which *Forbes* said "McClendon [was] up to his eyeballs in conflicts." (¶8). McClendon was also motivated to conceal that his personal lenders were also the primary lenders to Chesapeake and avoid, at a minimum, the appearance of conflicts of interest. (¶¶86-88). The massive size of the loans aggravated the conflicts and added to McClendon's motive to conceal them. (¶¶7-9, 41, 46, 87, 92, 116, 133). *In re Salomon Analyst*, 350 F. Supp. 2d 455, 472 (S.D.N.Y. Dec. 2, 2004) (conflict of interest supported strong inference of scienter).[12]

McClendon also had a financial motive to conceal the loans to ensure the FWPP's continuation. *Tellabs*, 551 U.S. at 325 ("Personal financial gain may weigh heavily in favor of a scienter inference"). The FWPP had increased McClendon's net worth by $400 million, but the Company terminated it when his loans were disclosed. (¶¶41,116). *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1259 (N.D. Ok. 2003) ("*Williams II*") (failure to disclose defendants' compensation size is an indicia of scienter).

Finally, McClendon's forced resignation as Chairman of the Board further supports a strong inference of scienter. (¶116); *Hall*, 580 F. Supp. 2d at 233.

McClendon's scienter is imputed to the Company. *Adams*, 340 F.3d at 1106.

---

[12] *See also Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 295 (S.D.N.Y. 2004) ("conflicts of interest [raise] strong circumstantial evidence of conscious misbehavior"); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 157 (S.D.N.Y. 2004) (allegation of motive is stronger when conflict of interest is not disclosed).

**(b) Scienter Against The Remaining Defendants Is Strong**

The "Remaining Defendants" include Chesapeake's most senior officers,[13] and their positions support the totality of the scienter allegations. These executives "were in a position to know [about the FWPP loans], understand [their] materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors." *Williams II*, 339 F. Supp. 2d at 1259. This is reinforced by Hood's admission after the fraud was disclosed that the Board was "fully aware" about McClendon's FWWP loans. (¶84). The Board's knowledge demonstrates the loans' importance and supports a strong inference of the Remaining Defendants' knowledge of the loans. *Adams*, 340 F.3d at 1106 ("the fact that [the CFO] was aware that the financial statements were false reduces the likelihood that [the CEO] was ignorant of that fact.").[14]

In addition to their executive positions, a plethora of additional allegations, *in toto*, raise a strong inference of scienter with respect to the Remaining Defendants. *Tellabs*, 551 U.S. at 322. First, the FWPP was a focal point for investors and management. Indeed, the focus on the FWPP was so intense that the Company did not limit its discussion to its SEC filings. (¶¶42-45, 133-138). Defendant Hood even wrote a lengthy

---

[13] Dell'Osso, the CFO; Johnson, the Chief Accounting Officer ("CAO"); Hood, the General Counsel; Rowland, the Executive Vice President of Finance and Compensation Committee member; and Mobley, the head of investor relations and research. (¶¶24-27).

[14] Later, Hood conveniently modified his admission to say the Board was only "generally aware." (¶84). Whether the Board was "fully" or "generally" aware is now a factual matter. Either way, Defendants had a duty to be informed about the FWPP loans. "[A]n egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an inference of . . . recklessness." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

letter to *The Daily Oklahoman* on April 30, 2009 claiming that the FWPP properly aligned McClendon's interests.  (¶136).  After affirmatively discussing the "alignment of interest," Defendants had a duty to speak fully and disclose the critically related loans. (¶¶8, 85); *Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *8 (D. Kan. Sept. 25, 2012) (once defendants spoke, they had a duty to speak truthfully and make any additional disclosures needed to avoid rendering the statements misleading).

Second, the failure to disclose McClendon's loans violated GAAP and SEC regulations (¶¶49-57), and adds to the totality of the allegations raising a strong inference of scienter.  *Pirraglia*, 339 F.3d at 1192 (GAAP violations and accounting improprieties additionally support an inference of scienter).  Johnson and Dell'Osso in particular (as the CFO and CAO, respectively, and signatories of the 2009-2011 Forms 10-K), knew or should have known that McClendon's loans (i) had to be disclosed under GAAP and SEC regulations, and (ii) created a conflict of interest.  (¶¶26, 49-56, 176).

Third, the sheer size of the loans supports a strong inference of scienter. *SemGroup*, 729 F. Supp. 2d at 1300 ("The magnitude of speculative trading and margin balance alleged in the Complaint further evidences scienter.").

Fourth, McClendon, Rowland and Dell'Osso executed certifications under Section 302 of SOX, stating that Chesapeake's financial reports were not misleading and, further, that they had "establish[ed] and maintain[ed] disclosure controls and procedures [] and **internal control** over financial reporting."  (¶¶171, 173, 175).  *SemGroup*, 729 F. Supp.

2d at 1298 (SOX certifications further support a strong inference of scienter).[15]

### 3. Plaintiff Has Adequately Pled Scienter Concerning Defendants' Statements About The VPPs And Debt Reduction Strategy

Like the FWPP, the VPPs were a key topic of public discussion among Defendants and investors. (¶¶66-70, 143-48). Defendants consistently extolled the virtues of the VPPs' upfront cash payments and purportedly salutary effect on Chesapeake's finances. *Id*. Investors relied on the VPP-related statements, with Morningstar concluding that "the financing method [Chesapeake] put in place at that time – most notably volumetric production payments . . . served an essential financing tool for the firm." (¶69). The VPPs were thus a key component of Chesapeake's debt reduction strategy, which Defendants claimed "dramatically improved" the Company's financial condition. (¶126).

Yet Defendants concealed that the VPPs actually **raised** Chesapeake's debt by $1.4 billion. (¶12, 106). Defendants' admitted involvement and knowledge of VPPs raises a strong inference that they had actual knowledge of the associated debt. (¶76). *Novak*, 216 F.3d at 308 (allegations that defendants touted new source of revenue when they should have known that import restrictions limited those revenues supported inference of scienter). The opposing inference is not only weak, it is not plausible.

Defendants do not dispute knowledge of the $1.4 billion VPP costs, and that alone is sufficient to establish scienter. *SemGroup*, 729 F. Supp. 2d at 1297 (knowledge of facts contradicting public statements gives rise to a strong inference of scienter). At a

---

[15] Hood's removal from his position as General Counsel also supports a strong inference of his scienter. (¶116); *see Hall*, 580 F. Supp. 2d at 233.

minimum, Defendants' knowledge of the increased debt created by the VPPs is a "fact that was so obviously material [to Chesapeake's finances] that the defendant[s] must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *City of Philadelphia v. Fleming Co.*, 264 F.3d 1245, 1261 (10th Cir. 2001).

In addition, in weighing the totality of the allegations, the same reasons that apply to the FWPP serve here as additional relevant factors supporting a strong inference of scienter. *See supra* at III.C.2. First, because of their positions as high-level executives, their knowledge of Chesapeake's core operations and financial strategies, such as the 25/25 Plan and VPPs, is presumed. Second, Defendants' failure to disclose the $1.4 billion VPP obligation violated GAAP and SEC disclosure rules. (¶¶72-77). Third, McClendon, Dell'Osso, and Rowland executed the SOX certifications falsely attesting that the financial statements were true and accurate while they knew that the VPP increased debt remained concealed. (¶¶202-04). And fourth, Defendants had a strong motive to conceal the VPP liabilities to prevent Chesapeake's creditors from discovering the true extent of its debt and cutting off its liquidity. (¶¶108-13). *See Williams I*, 339 F. Supp. 2d at 1234 ("strong motive to misrepresent [the] financial statements where . . . continued viability was dependent upon certain measure of . . . financial performance").

### 4. Defendants' Counter-Arguments Are Unavailing

The Absence Of Insider Trading Does Not Refute Scienter. The Individual Defendants argue they lacked scienter because they did not engage in insider trading during the Class Period. (Def. 11). But it is black letter law that the "absence of insider trading . . . is not dispositive of the scienter analysis." *SemGroup*, 729 F. Supp. 2d at

1299 n.9 (citing cases).  As the Tenth Circuit has reiterated, "[w]e will not, as defendants

request, infer from the fact that they did not sell their Novell stock that they lacked

motive to defraud investors." *Pirraglia*, 339 F.3d at 1191 n.12; *see also*, *e.g.*, *No. 84*

*Employer-Teamster v. America West,* 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be

established even if the officers who made the misleading statements did not sell stock").

        The Individual Defendants then argue that their "increased [] stock holdings" also

refutes scienter.  (Def. 11).  This conveniently omits that they received almost all of their

shares during the Class Period in the form of free compensation awards or stock options

from the Company.[16]  (Exs. 3-6).  They then exercised these compensation awards and

received shares that increased their holdings.  But they did not use their own cash.  The

Individual Defendants thus "increased their stock holdings" for free. (Def. 11).  In fact,

the Individual Defendants even disposed of some of the awarded shares to pay the related

tax liability.   (*See* Exs. 3-6).  In light of this, Defendants' scienter argument falls flat.

(Def. 11).[17]  The free "increase in stock holdings" does not raise any inference of trust or

---

[16] Plaintiff sets forth a detailed summary of each Individual Defendant's stock holdings
and transactions, together with the supporting SEC filings, in Exhibits 3-6.

During the Class Period, McClendon received 1,814,175 free shares, purchasing only
44,600 shares on the open market (Ex. 3); Dell'Osso received 305,577 free shares, and
purchased only 9,000 shares on the open market (Ex. 4); Johnson received 299,315 free
shares, and purchased no shares on the open market (Ex. 5); and Hood received 340,849
free or discounted shares, and purchased no shares on the open market (Ex. 6).

Significantly, Hood also sold call options on March 30, 2011 on 75,000 shares with a $40
strike price (nearly 13% of his holdings), effectively betting **against** the Company.  *Id.*

[17] All of the decisions cited by Defendants to support their argument that increased stock
holdings negate an inference of scienter are distinguishable because none considered

confidence in Chesapeake's future, and is thus not inconsistent with fraudulent intent.[18]

Finally, even if these so-called acquisitions qualified as real purchases rather than free options, they are still irrelevant because Defendants did not control the timing or content of the disclosures. (¶¶78-79, 106); *see Middlesex v. Quest,* 527 F. Supp. 2d 1164, 1186 (C.D. Cal. 2007) ("Defendants did not know when or even if this report would be released; it is therefore unsurprising that Defendants did not sell . . . their stock").

Restatements Or Internal Documents Are Not Prerequisites to Plead Scienter. Defendants also argue that the absence of a restatement defeats scienter. (Def. 10, 21-22). They are wrong. "[T]he fact that the financial statements . . . were not restated does not end [plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts," and allow officers and directors "to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement . . . ." *Aldridge v. A.T. Cross*, 284 F.3d 72, 83 (1st Cir. 2002); *see also Pirraglia*, 339 F.3d at 1193 (sustaining securities claims absent action by the SEC or auditors).

Defendants similarly contend that the absence of allegations based on internal reports or confidential witness is "fatal." (Def. 8, 10). This is not Tenth Circuit law.

---

increased holdings arising from free stock awards or options. (Def. 11-12).

[18] While McClendon purchased about 44,000 shares in the open market, this represents merely 2% of the two million shares he held at the beginning of the Class Period. (Ex. 1); (Def. 12). No inference can be drawn from this small purchase, just as no inference could be drawn from McClendon's sale of $18 million worth of stock to exercise his options. (Ex. 1); *see Dynegy*, 339 F. Supp. 2d at 909.

Scienter requires the Court to engage in a "fact-specific inquiry, which is bound not by

labels or magic words but by the totality of the facts presented in the complaint, [and

which] best reflects the intent of Congress [in passing the PSLRA] . . . Congress was

concerned with the quantum, not type, of proof."[19] *Fleming*, 264 F.3d at 1263; *Pirraglia*,

339 F.3d at 1190 (scienter requires holistic analysis). Alleging contradictory internal

reports or confidential witness statements is not required to plead scienter.[20]

      Plaintiff's Allegations of Scienter Are Particularized. Defendants try to recast

Plaintiff's particularized scienter allegations as merely "generalized imputations of

knowledge" by relying on *Fleming*. (Def. 9). But in *Fleming*, plaintiffs failed to allege

"what percentage of [the Company's] total or current assets, or total net worth" the

alleged undisclosed litigation represented, and thus failed to establish its "obvious"

significance, such that the defendants should have known that omitting it would mislead

---

[19] Defendants incorrectly cite *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336
(N.D. Ga. 2010) to argue that certain "key elements" are required to establish "viable
securities fraud complaints." (Def. 10). *Homebanc* noted that a "typical securities fraud
case" would include allegations of a restatement, auditor resignations, **accounting
irregularities**, insider trading, **motive, or actual accounting deficiencies**. *Id.* at 1358-
59. But *Homebanc* does **not** say that this list is exhaustive, and states that "not all of
these facts have to be present . . . to establish scienter." 706 F. Supp. 2d at 1359. In any
event, the Complaint here does plead many of the factors set forth in *Homebanc*,
including those bolded above. (¶¶46-52, 55, 57, 72-76, 78, 86-88, 95, 104, 108).
*Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307 (S.D. Fla. 2004), is similarly
inapposite. Like in *Homebanc*, *Druskin* only listed **examples** of allegations that support
an inference of scienter, and acknowledged that none are "essential." *Id.* at 1323-24.

[20] *See In re Cardinal Health Inc.*, 426 F. Supp. 2d 688, 740 (S.D. Ohio 2006) (finding an
inference of scienter in the absence of contrary internal reports); *In re ArthroCare Corp.
Sec. Litig.*, 726 F. Supp. 2d 696, 720, 725 (W.D. Tex. 2010) (finding confidential
witnesses unpersuasive but nonetheless finding that plaintiff sufficiently alleged scienter).

investors.  264 F.3d at 1250-51.  Here, Plaintiff alleges the importance of the FWPP, the

amount of debt overhang, the debt-reduction strategy, and the VPPs.  (¶¶40-45, 58-70).

Plaintiff also alleges not only that Defendants highlighted the FWPP and Chesapeake's

commitment to debt reduction, but also that investors were concerned about those issues.

(¶¶40-45, 58-64).  Plaintiff then alleges Defendants' frequent references to the use of

VPPs to achieve debt-reduction goals.  (¶¶65-70).  And Plaintiff finally alleges that the

revelation of the VPP liabilities compromised Chesapeake's liquidity.[21]  (¶¶108-12).

### D.    The Complaint Is Not A "Puzzle Pleading"

Defendants finally argue that they are confronted with a "puzzle" pleading.  (Def.

6-7).  This critique is not remotely applicable, and courts regularly reject such arguments

for complaints much lengthier and complicated than this one.  The Complaint is carefully

organized, "divided into clear sections with headings and subheadings identifying [the]

aspects of [Chesapeake's] business" that Defendants misrepresented. *City of Lakeland v.

Baxter*, 2012 WL 607578, at *5 (N.D. Ill. Jan. 23, 2012) (rejecting puzzle pleading).  The

Complaint also identifies each material misstatement, (¶¶122-178), "including bolding

and italicizing the precise statements," and states the reasons why the statement was

materially false and misleading when made.  *Id*.  While Plaintiff includes a list of all the

SEC filings during the Class Period for ease of reference (¶121), no reasonable reading of

---

[21] *Lillard* is also distinguishable.  (Def. 9).  Scienter allegations in *Lillard* consisted of
only: "Defendants intentionally and/or recklessly misled plaintiffs as to the nature and
attributes of the securities described herein above. The acts of the Defendants were
deceitful and in furtherance of their scheme to defraud."  Complaint, 2001 WL 34781781,
at *39 (N.D. Okla. Sept. 10, 2001).  Plaintiff's fulsome scienter allegations specific to
each Defendant here stand in stark contrast to that bare, conclusory allegation.

the Complaint suggests that Plaintiff is alleging false statements not specifically quoted, as Defendants claim.  (Def. 6).  *See Williams II*, 339 F. Supp. 2d at 1261 (rejecting "puzzle-style" argument where complaint "provides notice to each defendant regarding the statements and omissions that plaintiffs allege are misleading and the reasons why"); *In re Vivendi*, 381 F. Supp. 2d 158, 170-71 (S.D.N.Y. 2003).  Tellingly, Defendants have had no trouble identifying the claims and making their arguments.  Their protestations that they cannot understand the suit against them simply ring hollow.[22]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

DATED: January 23, 2013

Respectfully Submitted,

s/ *David Keesling*

David Keesling, OBA #17881
Heidi Shadid, OBA #22897
RICHARDSON, RICHARDSON,
BOUDREAUX, KEESLING, PLLC
7447 South Lewis Avenue
Tulsa, Oklahoma 74136
Telephone: (918) 492-7674
Facsimile: (918) 493-1925

Joseph A. Fonti (*pro hac vice*)
Javier Bleichmar (*pro hac vice*)
Dominic J. Auld (*pro hac vice*)
Cynthia Hanawalt (*pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway, 34th Floor
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Local Counsel for Lead Plaintiff
Ontario Teachers' Pension Plan Board
and the Class*

*Lead Counsel for Lead Plaintiff
Ontario Teachers' Pension Plan Board
and the Class*

---

[22] Defendants only contest Plaintiff's Section 20(a) claims in a footnote on the basis that there is no primary liability under Section 10(b).  (Def. 25 n.39).  Because Plaintiff's Section 10(b) claims are viable, Plaintiff's Section 20(a) claims should also be sustained.